**NATIONAL TREASURY EMPLOYEES UNION, et al., Plaintiffs,**

v.

**Richard LYNG, Secretary of Agriculture, et al., Defendants.**

Civ. A. Nos. 88–2515, 88–2668.

United States District Court, District of Columbia.

Dec. 8, 1988.

Elaine Kaplan, for Nat. Treasury Employees Union.

Kim D. Mann, for Nat. Ass'n of Agr. Employees.

Peter Robbins and Mary E. Goetten, Washington, D.C., for the U.S. Dept. of Justice.

## MEMORANDUM OPINION

FLANNERY, District Judge.

Plaintiffs National Treasury Employees Union ("NTEU") and National Association of Agricultural Employees ("NAAE"), the collective bargaining representatives of various employees of the United States Department of Agriculture ("USDA"), have moved for a preliminary injunction against certain portions of the USDA's Drug Free Workplace Program (the "program" or "plan"). Specifically, plaintiffs challenge the provisions of the USDA's program that require random urinalysis testing of employees in so-called "testing designated positions" and "reasonable suspicion" urinalysis testing of all employees not in safety related positions. The plaintiffs argue that the proposed testing is an unconstitutional infringement of their members' Fourth Amendment rights against unreasonable searches and seizures.

The various defendants [1] argue collectively that the USDA's compelling interests in ensuring public safety, guaranteeing the security of confidential government information, and establishing and maintaining integrity of the nation's drug interdiction efforts justify the challenged urinalysis testing programs. They argue that the employees have a diminished expectation of privacy in their jobs and that these diminished privacy interests are not unreasonably infringed by the challenged urinalysis testing provisions.

The challenged urinalysis testing provisions are not required in conjunction with any regular employment-related medical examinations. Instead, the program requires that those employees designated for testing, under either of the challenged provisions of the plan, report to a collection site usually within two hours of notification, where they will be required to produce a urine sample under the direct or indirect observation of a collection monitor. Direct observation of the production of a urine specimen is *mandatory* for all "reasonable suspicion" urinalysis testing under the USDA plan.

Because the defendants have failed to demonstrate, under the applicable case law, that the proposed random urinalysis testing is justified at its inception, the court enjoins the implementation of that portion of the USDA's plan. However, the court finds that the proposed "reasonable suspicion" urinalysis testing of employees in non-safety related positions, if based on reasonable, articulable, and individualized suspicion that a specific employee may be under the influence of drugs, satisfies the appropriate standard of reasonableness under the Fourth Amendment. The court thus denies plaintiffs' motion for a preliminary injunction of the USDA's proposed "reasonable suspicion" testing, as clarified.[2] The basis for these rulings is set out below.

## I. FACTUAL BACKGROUND

### 1. *The Parties*

NTEU is the exclusive bargaining representative of approximately 140,000 federal employees, including 812 employees of the USDA's Food and Nutrition Service ("FNS"). NTEU is the collective bargaining representative of two positions (and a total of five employees) that will be subject to random urinalysis testing under the USDA's program.[3] All of the employees

---

**1.** The defendants in these cases are collectively responsible for the implementation of the USDA's Drug Free Workplace Program. They include Ronald Reagan, USDA Secretary Richard Lyng, the Administrator of the Food and Nutrition Service, Anna Kondratus, and the Administrator of the Animal and Plant Health Inspection Service, Dr. James W. Glosser, all in their official capacities.

**2.** The court also denies at this juncture of the litigation the defendants' motions for summary judgment and dismissal of various counts in both complaints.

**3.** These positions are motor vehicle operators (a total of three employees) and computer specialists (a total of two employees). At oral argument on the various motions, attorneys for NTEU indicated that at least one current job holder in each of these job categories had joined

represented by NTEU within the FNS will be subject to reasonable suspicion urinalysis testing. The defendants in this case are President Ronald Reagan, USDA Secretary Richard Lyng, and Anna Kondratus, Administrator of the Food and Nutrition Service.

NAAE is the exclusive collective bargaining representative of non-management employees of the Plant Protection and Quarantine ("PPQ") program within the USDA's Animal and Plant Health Service ("APHIS"). Of the approximately 1,000 nationwide non-management PPQ employees subject to random urinalysis testing, over 600 are members of NAAE. Approximately 750 non-management PPQ employees represented by NAAE will be subject to both random and reasonable suspicion urinalysis testing under the USDA's plan. The defendants are USDA Secretary Richard Lyng and Dr. James Glosser, Administrator of the USDA's Animal and Plant Health Inspection Service.

### 2. *The USDA's Plan*

On September 15, 1986, President Reagan issued Executive Order 12564, entitled "Drug–Free Federal Workplace." 51 Fed. Reg. 32,889 (1986). The order authorized the head of each executive agency to develop a plan to achieve the objective of a drug free workplace. E.O. 12564 required these agency plans to include policy statements, employee assistance programs, supervisory training, and testing to identify illegal drug users. *Id.* at 32, 890. The testing provisions included requirements for voluntary and random testing for individuals in "sen-

sitive," testing designated positions and authorization for reasonable suspicion, post-accident or unsafe practice, and applicant testing.[4] The designation of employees in sensitive positions and the extent of testing was left to the discretion of the individual agency heads.

Pursuant to this authority, the USDA issued the details of its Drug Free Workplace Program on August 8, 1988. Agriculture Dep't Pers'l Manual Supplement 792–3. ("DPM Supp."). Citing its role in establishing policies which affect every aspect of agriculture, the USDA noted that it was crucial that these policies be developed and implemented in a drug-free environment. *Id.* at 1. Although the department acknowledged that the incidents of illegal drug use impacting upon its mission were low "when compared with the number of employees," *id.*, it nonetheless implemented a program providing for employee counseling and assistance, supervisory training, employee education, and urinalysis testing on both a random basis and in each of the areas authorized by E.O. 12564.[5]

The USDA had already issued a general notice on July 1, 1988, to all employees that the urinalysis testing provisions of its Drug–Free Workplace Program would commence in 60 days or later. The July 1, 1988, announcement identified the major provisions of the program and specified the various employee categories subject to urinalysis testing. USDA Sec'y Mem. 4430–1 at 1–2. In addition, those employees in testing designated positions (TDPs) individually received notice on August 16, 1988, that random urinalysis testing would com-

---

NTEU. This development apparently satisfied the attorneys representing the defendants to drop their objections to NTEU's standing, at least as far as the challenge to the random urinalysis testing of the computer specialist positions, as no reference to this objection was made at oral argument nor in the Defendants' Proposed Order submitted at the court's request following the hearing. As such, the court does not reach the merits of defendants objection to NTEU's standing.

**4.** The Executive Order provides in section 5(h) that: "Agencies are not required to report to the Attorney General for investigation or prosecution any information, allegation, or evidence

relating to a violation of Title 21 of the United States Code received as a result of the operation of drug testing programs established pursuant to this Order." 51 Fed.Reg. 32,892 (1987). Congress subsequently prohibited the disclosure of drug test results to law enforcement officials without an employee's consent. Supplemental Appropriations Act of 1987, Pub.L. 100–71, § 503(e), 101 Stat. 391, 471.

**5.** The program calls for 1) applicant testing, 2) reasonable suspicion drug testing, 3) injury, illness, unsafe or unhealthful practice testing, 4) voluntary testing, and 5) testing as part of or as follow-up to counseling or rehabilitation. DPM Supp. at 1.

mence no earlier than 30 days later. USDA Ass't Sec'y for Admin's 30–Day Notice Memo. Due to a series of administrative complications, testing had not begun before the pending motions became ripe for decision by this court.[6]

### 3. *The Collection Procedures*

The testing procedures under the USDA's plan adhere to the technical guidelines for drug testing programs promulgated by the Department of Health and Human Services ("HHS").[7] A basic outline of the applicable procedure follows. An individual in a testing designated position will be selected for testing on some neutral basis like social security numbers. Employees selected on this basis are directed to a collection site usually within two hours of selection.

Upon arrival at the designated site, an employee will be met by a collection monitor of the same sex. The collection monitor is responsible for ensuring the integrity of the specimen collection procedures. In addition to securing the collection facility itself,[8] the collection monitor is required to verify proper photo identification, require the employee to remove any unnecessary outer garments that might conceal items or substances that could be used to adulterate a urine specimen.[9] After washing his or her hands, the employee is directed to a stall or other enclosure where the sample is to be produced.

The collection monitor is directed to note any unusual behavior or appearance in a permanent record book both before and during the production of a sample. Collection monitors are authorized to directly observe the production of a sample in instances where they have reason to believe the individual employee may alter or substitute the specimen provided.[10] The USDA program *requires* direct observation of sample production for all employees subject to testing for reasonable suspicion of drug use or impairment.

### 4. *The Testing Procedure*

In compliance with HHS guidelines, the USDA program calls for a two level testing process of urine specimens.[11] A sample will initially be screened using the radioimmunoassay (RIA) method with initial cutoff levels specified in the HHS regulations. Testing will be conducted in five drug categories: marijuana, cocaine, opiates, amphetamines, and phencyclidine (PCP).[12] All specimens identified as positive on the initial test shall be confirmed using the

6. At a scheduling conference on October 28, 1988, the defendants, through counsel, advised the court that testing could not begin before early November. At that conference, the court asked for assurances from counsel that no testing begin before the court had an opportunity to rule on the pending motions. These assurances were received later that afternoon.

7. These guidelines were issued as Appendix 3 to DPM Supp. 792–3.

8. The HHS guidelines authorize the use of toilet bluing agents to deter the dilution of specimens and the removal of all other sources of water in the enclosure where the urination is to occur.

9. The collection site personnel are further required to ensure that all personal belongings such as a briefcase or purse remain with the outer garments outside the enclosure where urination occurs.

10. Direct observation may be required by collection site personnel or an Employee Counseling Services Program Manager. The USDA Program indicates that direct observation may be warranted when: facts and circumstances suggest that an employee is a drug user; facts and circumstances suggest that an individual is under the influence of drugs at the time of the test; an individual has previously been found to be a drug user by the USDA; facts and circumstances suggest that the individual has equipment of implements capable of tampering with, or altering urine samples; an individual has previously tampered with a sample. DPM–Supp. at 19. The HHS regulations also require that a second sample be taken when the temperature of the initial sample falls outside a specified temperature range.

11. The parties dispute the nature of the accuracy of the testing procedures. For the purposes of this motion, however, the court need not resolve this dispute.

12. The USDA program also notes that for reasonable suspicion drug testing, employees may be tested for any drug listed in Schedule I and II of the Controlled Substances Act. Testing for any additional substances must be approved by HHS in advance. DPM Supp. app. B at 1.

gas chromatography/mass spectrometry (GS/MS) technique at the same cut-off levels.

Only confirmed positive test results will be reported to the Medical Review Officer (MRO) at the USDA. Any employee with a positive test result will then be given the opportunity to present evidence to justify the result before the MRO.[13] If the MRO determines there is no justification for the positive result,[14] the now verified positive test result will be reported to the USDA's Employee Counseling Services Program Manager and to the management official empowered to recommend or take disciplinary action.[15]

Under the USDA program, an employee with a verified positive urinalysis test will be subject to "the full range of disciplinary actions." While the severity of the disciplinary actions will depend on the circumstances of the individual case, a proposal for some disciplinary action is required. The exclusive list of alternatives includes reprimand, enforced leave, suspension without pay, reduction in grade or rate of pay, or removal.[16] Removal from service is mandatory for the failure to obtain counseling following a finding that an employee is using illegal drugs, has refused to be tested, or failed to refrain from illegal drug use after an earlier finding of such use.[17]

### 5. The Testing Designated Positions

Under the terms of E.O. 12564, the Secretary has apparently determined that all the sensitive positions identified in the Department will be designated for testing (TDPs). The plan calls for 100% testing of all TDPs in the first year with an annual testing rate of 25% thereafter.

The TDPs at issue here are two FNS computer specialists, five FNS motor vehicle operators, and approximately 761 GS 436 (non-management) PPQ officers. According to the plan, the computer specialists have been designated because of the government's interest in preserving internal security. The plan notes that these specialists are significantly involved in "critical" USDA missions and pose a "relatively high" risk of effecting grave damage or realizing significant personal gain.[18]

13. HHS regulations require the MRO to be a licensed physician with knowledge of substance abuse disorders. The MRO may be an agency or contract employee. The USDA program gives the MRO discretion to accept evidence "in any manner deemed most efficient." DPM Supp. at 19. The possibilities include a review of the individual's medical history, conducting a medical interview with the individual, or a review of any other relevant biomedical facts. However, the MRO must review all medical records made available by the tested individual when a confirmed positive test result could have resulted from legally prescribed medication. DPM Supp. app. C at 9.

14. A determination by the MRO that a positive test result is justified by "licit and appropriate medical or scientific documentation" will be treated as a negative test result. DPM Supp. at 21.

15. The USDA program is nebulous as to the direct authorization for informing the appropriate management official. The program indicates that the ECSP manager will be informed of a verified positive test result. DPM Supp. at 19. The program also indicates that an employee need not give permission for the release of a verified positive test result "to any supervisory, administrative, or management official having authority to take adverse personnel action

against such an employee." DPM Supp. at 21. In addition, the HHS regulations require that the MRO report a verified positive test result to an appropriate management official. Id. at app. C at 8. This mandatory disclosure is also consistent with the prescribed disciplinary requirements detailed below.

16. DPM Supp. at 12.

17. DPM Supp. at 12. The USDA program also requires random, follow-up urinalysis testing of employees who are found to have used illegal drugs previously. Id. at 18. As noted above, a verified positive test result is one method of initially determining illegal drug use. This follow-up testing is required for a period of at least two years during which an employee will be tested at least three times. Id. This testing period is in addition to any testing required during an employee's counseling program. Thus, the first verified positive test result subjects an employee to an extended period of random testing with mandatory removal as a consequence of a second positive result.

Removal from service is also mandatory when an employee is found to have attempted to alter or substitute specimens or to have distributed or sold drugs. Id. at 12.

18. DPM Supp. app. A at 1. The full text of the designation reads as follows:

Motor vehicle operators have been selected because of the government's interest in safety due to the risks they pose to passengers, the public, and to property and because "[t]he use of illegal drugs is inconsistent with the responsibility of safe vehicle operation."[19] The PPQ officers were selected to preserve the integrity of the government's drug interdiction efforts due to the "not uncommon" instances when they find drugs in the course of performing their responsibilities of ensuring that no prohibited agricultural products or pests enter the country. According to the plan, drug usage by these employees could reduce their effectiveness and compromise the success of the drug interdiction effort through blackmail and bribery.[20]

### 6. *Reasonable Suspicion Testing*

The program also provides that all USDA employees are subject to reasonable suspicion urinalysis testing. The trigger

for such testing is the suspicion that an employee "is using illegal drugs." DPM Supp. at 16. The plan identifies a non-inclusive list of factors upon which reasonable suspicion of such illegal use may be based. These factors are: 1) observable phenomena, such as direct observation of drug use or possession or physical symptoms of being under the influence of a drug; 2) a pattern of abnormal or erratic behavior; 3) arrest or conviction for a drug related offense, or the identification of an employee as the focus of a criminal investigation into illegal drug possession, use or trafficking; 4) information provided either by reliable and credible sources or independently corroborated; 5) newly discovered evidence that the employee has tampered with a previous drug test. *Id.*

Initial responsibility for determining reasonable suspicion under the USDA plan rests with supervisors or management em-

---

*Computer Related Positions:* Incumbents are in positions of sensitivity for computer-related positions. These positions involve functions such as development and administration of agency computer security programs, substantial and significant involvement in mission-critical systems or preparation or approval of data for input into a mission-critical system. They function with a relatively high risk for effecting grave damage or realizing significant personal gain with major responsibility for management of systems hardware and software.

Drug usage could result in inability to properly perform the duties of these positions, indiscretions while under the influence of drugs, or increased financial need which might cause an incumbent to improperly realize sensitive information, damage computer systems, or take actions to realize personal gain. *Id.* at 1–2.

19. DPM Supp. at 3. The full text of the designation reads as follows:

*Motor Vehicle Operator:* Incumbents operate motor vehicles such as buses, trucks, passenger vans, and other passenger carrying vehicles as their predominant duty and responsibility. The vehicles are used to move people and equipment including providing chauffeur services to high level officials. Vehicles must be operated in a safe manner to avoid endangering lives of the public or passengers, or risking the loss of property.

Drug Usage produces diminished mental and neuromuscular capacity. This could in turn lead to the operators inability to properly

control the vehicle, leading to the possible loss of life, personal injury, or destruction of property. For example, if the driver of a passenger carrying shuttle failed to notice a traffic light, death or serious injury could result to USDA employees and the general public. The use of illegal drugs is therefore inconsistent with the responsibility of safe vehicle operation. *Id.*

20. DPM Supp. at 3. The full text of the designation reads as follows:

*Plant Protection and Quarantine Officer.* Incumbents are responsible for inspecting incoming vessels and passengers to ensure that no prohibited agricultural products or pests enter the United States. Incumbents work closely and cooperate with Immigration and Custom Officials at ports of entry, especially the Mexican border. While no PPQ officer is required by statute to intercept illegal drugs, it is not uncommon for incumbents to find illegal drugs while performing their statutory responsibilities. When this occurs, the PPQ officer immediately refers the interception to Customs Officers. Incumbents must maintain the highest level of personal integrity and credibility.

Drug usage could result in inability to properly perform the duties of their positions, indiscretions while under the influence of drugs, or susceptibility to blackmail, bribes, or financial considerations. This could result in allowing illegal drugs to enter the United States, lead to a loss of trust and confidence in the Department of Agriculture, and diminish the quality of operation of the Federal

ployees, who are charged with gathering all information, facts and circumstances supporting their suspicion. This evidence is then presented to an agency personnel officer who has the responsibility to determine if reasonable suspicion exits.[21] The program calls for the personnel officer to promptly prepare a written record showing the circumstances which supported the basis for reasonable suspicion.[22]

Although the exact procedure to be followed once a determination to test on the basis of reasonable suspicion is not clear, the employee in question will apparently be directed to report to a designated site where a urine sample will be required. As noted above, a collection monitor is required to visually observe the production of a specimen in all cases of reasonable suspicion drug testing.

## II. LEGAL ANALYSIS

The Fourth amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

■ It applies to searches and seizures by government employers of the private property of their employees. *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987) (plurality opinion); *see id.* 107 S.Ct. at 1498 ("[i]ndividuals do not lose Fourth Amendment rights merely because they work for the government instead of private employer"); *id.* at 1497 ("it

would be 'anomalous to say that the individual and his private property are protected only when the individual is suspected of criminal behavior'") (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967)).

■ Fourth Amendment jurisprudence involves a two step analysis. First, a reviewing court must determine whether the conduct in question constitutes a search and seizure by infringing on an individual's reasonable expectation of privacy. For present purposes, this inquiry is settled: "[c]ompulsory urinalysis is a 'search and seizure' in this Circuit." *National Federation of Federal Employees ("NFFE") v. Carlucci*, 680 F.Supp. 416, 430 (D.D.C.) (citing *Jones v. McKenzie*, 833 F.2d 335, 339 (D.C.Cir.1987)), *stay pending appeal*, 690 F.Supp. 46 (D.D.C.1988); *Harmon v. Meese*, 690 F.Supp. 65, 67 (D.D.C.), *cert. denied*, ⸺ U.S. ⸺, 109 S.Ct. 328, 102 L.Ed.2d 345 (1988); *American Federation of Government Employees ("AFGE") v. Dole*, 670 F.Supp. 445, 447 (D.D.C.1987).[23]

A determination that the governmental action constitutes a search or seizure under the Fourth Amendment is only the start of the inquiry, however, because "the [Fourth] Amendment only prohibits 'unreasonable' searches and seizures...." *AFGE v. Dole*, 670 F.Supp. at 447. And, as the Supreme Court recently noted, "'[W]hat is reasonable depends on the context within which a search takes place.'" *O'Connor*, 107 S.Ct. at 1499 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985)).

The consideration of the context in which a search takes place yields the appropriate

---

inspection service necessary to protect American agriculture. *Id.*

**21.** DPM Supp. at 16. The program provides that this authority cannot be redelegated but does permit consultation of competent medical authorities, if necessary. DPM Supp. at 16.

**22.** DPM Supp. at 16. The program also requires the generation of a written report including the dates and times of drug-related incidents, the information from reliable sources, the rationale leading to the testing, the findings of the test, and any action taken. *Id.*

**23.** While the defendants disagree with this conclusion, they concede that it is the law of the circuit. Deft's Mem. in Opp. at 35 n. 20. Virtually every court to have considered the question of compulsory urinalysis has decided that it constitutes a search under the Fourth Amendment. *See, e.g., Railway Labor Executives Ass'n v. Burnley*, 839 F.2d 575, 580 (9th Cir.) (collecting cases), *cert. granted*, ⸺ U.S. ⸺, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *Patchogue–Medford Congress of Teachers v. Board of Education of the Patchogue–Medford Union Free School District*, 70 N.Y.2d 57, 517 N.Y.S.2d 456, 459, 510 N.E.2d 325, 327–28 (1987) (collecting cases).

standard of reasonableness to be applied under the Fourth Amendment. A determination of this standard requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983).

### 1. *Random Urinalysis Testing*

The customary standard of reasonableness under the Fourth Amendment is that a search be conducted pursuant to a warrant supported by probable cause.[24] "[I]t is settled ... that 'except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it is has been authorized by a valid search warrant.'" *O'Connor*, 107 S.Ct. at 1499 (quoting *Mancusi v. De Forte*, 392 U.S. 364, 370, 88 S.Ct. 2120, 2125, 20 L.Ed.2d 1154 (1968)).

Although the warrant and probable cause requirements are the customary standards of reasonableness, neither "is an irreducible requirement of a valid search and seizure." *NFFE v. Carlucci*, 680 F.Supp. at 430. The Supreme Court has recognized that although both the warrant and probable cause requirements "bear on the reasonableness of a search, ... in certain limited circumstances neither is required." *New Jersey v. TLO*, 469 U.S. at 340, 105 S.Ct. at 742 (quoting *Almeida–Sanchez v. United States*, 413 U.S. 266, 297, 93 S.Ct. 2535, 2541, 37 L.Ed.2d 596 (1973) (Powell, J., concurring)).

The Supreme Court has even validated searches without any form of individualized suspicion. *T.L.O.*, 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8 (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, 560–61, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976) (permitting vehicles to be stopped at a fixed checkpoint near the border without any suspicion to believe the particular vehicle contains illegal aliens)). The Court has recognized, however, that "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure," *id.*, and that exceptions are "appropriate only where the privacy interests implicated by a search are minimal...." *Id.*

Judge Hogan clarified the specific Fourth Amendment implications of government sponsored, random urinalysis testing at issue before him and before this court. He noted that "[r]andom testing, of course, is based on no suspicion whatsoever, and there exists no grounds at all for suspecting that the search represented by urinalysis will turn up evidence [of job related drug use or impairment]." 680 F.Supp. at 431. Thus, in the continuum of the Fourth Amendment, the USDA's random drug testing program is at the outer most edge, or the "envelope" of legitimacy.

In fashioning a standard to govern the legality of searches not supported by a warrant or probable cause, the Supreme Court has used a two-pronged inquiry: "first, one must consider 'whether the action was justified at its inception,' *Terry v. Ohio*, 392 U.S., [1] at 20, 88 S.Ct., [1868] at 1879 [20 L.Ed.2d 889]; second one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place,' *ibid.* [sic]" *T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 742–43.

The District of Columbia Circuit applied this standard to a suspicionless drug testing program instituted by the District of Columbia's Public School System in *Jones v. McKenzie*, 833 F.2d 335 (D.C.Cir.1987). The testing program was implemented in the School System's Transportation Branch in response to a perceived "drug culture" among the Branch's employees, including

---

**24.** Indeed, the plaintiff-NTEU originally asserted that both a warrant and probable cause should be required for reasonable suspicion urinalysis testing proposed by the USDA. Pltf NTEU's Mem. in Supp. at 50 ("employees in positions that do not involve public safety may not be required to submit to urinalysis absent a warrant and probable cause"). They subsequently abandoned their insistence on a warrant. Pltf–NTEU's Mem. in Reply at 47 ("[T]he Court should enjoin the USDA from requiring employees who do not occupy safety sensitive positions to submit to urinalysis tests in the absence of probable cause.")

evidence of "repeated incidents of bizarre or dangerous drug-related behavior by drivers and attendants while on duty," as well as instances where "syringes and bloody needles were found in restrooms used by Transportation Branch employees." [25]

After other attempts to deal with the problem had yielded only "mixed results," *id.* at 336, the School System announced that mandatory urinalysis testing for drugs would be required of all employees required to undergo medical exams for work-related purposes.[26] The urinalysis testing was thus implemented as part of an annual, employment-related medical examination and samples were to be provided in the privacy of a restroom. *Id.* at 337. In a suit brought by a bus attendant terminated when her urinalysis test was positive for THC metabolites (indicating marijuana use), a district court found in favor of plaintiff and, among other things, enjoined the Transportation Branch from conducting any urinalysis testing without probable cause.[27]

The D.C. Circuit reversed the district court's injunction requiring probable cause before conducting any urinalysis testing, finding that it was not unreasonable to require drug testing where safety interests were high, the testing was conducted as part of a routine, reasonably required, employment-related medical examination, and the test employed is one that has a sufficient nexus to the employer's legitimate safety concerns. *Id.* at 341. After noting that the suspicionless urinalysis testing constituted a search under the Fourth Amendment, *id.* at 338, the D.C. Circuit proceeded to employ the two-pronged inquiry described above [28] by balancing "the intrusion on the individual's Fourth Amendment interests, *i.e.*, the privacy expectations which society recognizes as legitimate, against the governmental interest[s] involved...." *Id.*

In striking this balance, the court made a number of findings pertinent here. First, the court noted that there were "strong privacy interests" involved in urinalysis testing. *Id.* at 339. The court intimated that there were two separate components to these privacy interests: those interests surrounding the production of the sample itself [29] and those interests in the analysis of the specimen produced. Although the first interest was not seriously intruded upon because the samples were provided in private during an employment related medical exam, the court found that the second component was significantly affected by urinalysis testing: "[b]ecause drug

**25.** *Jones,* 833 F.2d at 336. The head of the Transportation Branch estimated "that 60% of the employees assigned to the Transportation Branch were using narcotics to some extent." *Id.* The urinalysis testing was implemented to enforce an earlier directive issued by the School System which prohibited school personnel from possessing, using, or being under the influence of "intoxicating liquors, narcotics, or other drugs such as LSD, marijuana and the like, while on school premises." *Id.* at 337.

**26.** *Id.* at 337. Although medical examinations were required of only bus drivers at the time of the announcement of urinalysis testing, all Transportation Branch employees, including mechanics and school bus attendants, were subsequently required to undergo medical examinations. *Id.* at 337 n. 4

**27.** *Jones v. McKenzie,* 628 F.Supp. 1500 (D.D.C. 1986) (order). The injunction restricted urinalysis testing of plaintiff "without first establishing probable cause to believe that she is using or under the influence of illicit drugs based on specific objective facts." *Id.* The trial court also found that plaintiff's dismissal on the basis

of an unconfirmed urinalysis test was arbitrary and capricious under District of Columbia law, 628 F.Supp. 1500, 1507 (D.D.C.1986), that urinalysis testing was an unreasonable search in the absence of probable cause. *Id.* at 1509. The School System appealed only that part of the decision enjoining urinalysis testing without probable cause. 833 F.2d at 336.

**28.** The test, as described by the court, was to consider "both whether the search was justified at its inception, and whether the search as actually carried out was reasonably related to its objectives and not excessively intrusive." 833 F.2d at 339 (quoting *T.L.O.*). The plaintiffs contend, and the defendants concede, that in this circuit, the USDA's suspicionless drug testing program must satisfy both prongs of this test to be sustained by the court.

**29.** The court noted that "[r]equiring that the specimen be produced under some form of observation would obviously raise different privacy concerns...." *Id.* at 340 n. 11.

tests often furnish information about employee activities occurring outside of working hours, such tests may provide Government officials with a periscope through which they can peer into an individual's behavior in her private life, even in her own home." [30]

Because there were strong privacy interests involved, the D.C. Circuit noted that they could be outweighed by only "strong governmental concerns." *Id.* at 340. Here the court found *"serious* safety concerns on the other side of the balance." *Id.* (emphasis in text). The court noted that the School System's mission of safely transporting handicapped children to and from school was directly threatened if Transportation Branch employees were allowed to work under the influence of illicit drugs. *Id.* The court also found it "noteworthy" that the safety concerns were prompted "not only by the nature of the jobs in the Transportation Branch, but also by the strong evidence of a veritable 'drug culture' among Transportation Branch employees." [31] In light of this "significant and compelling governmental interest," the D.C. Circuit found that the Transportation Branch's urinalysis testing as part of a routine, employment-related medical examination was justified at its inception. [32]

The court went on to note that the School System's urinalysis testing failed under the second prong of its inquiry (that the test be "reasonably related in scope to the circum-

stances which justified the interference in the first place" *id.* at 340). This failure followed directly from the School System's concession that the drug testing procedure it had employed, the EMIT Cannabinoid Urine Assay, "lack[ed] a sufficient nexus to the [School System's] legitimate concern that its employees not possess, use or be under the influence of drugs while on duty, . . ." [33] The court concluded by noting that "any drug test the School System employs in the future must be one that validly detects the activity with which the School System is legitimately concerned." *Id.* at 341.

### 2. Application of the Law to This Case

■ Under the D.C. Circuit's reasoning in *Jones v. McKenzie,* this court holds that the USDA has not justified its proposed random urinalysis testing provisions at its inception. [34] As the basis for this holding, the court finds that the intrusions upon the employees' legitimate expectations of privacy are significantly greater here than in *Jones.* At the beginning of its analysis in *Jones,* the D.C. Circuit stressed that the question before it was limited to suspicion-less urinalysis testing in "the context of a regular, medical examination for employment purposes" and the court further noted that "no claim has been raised that the annual physical examination required of

30. *Id.* at 339. The court also cited with approval a district court in New Jersey which found that drug testing is "a form of surveillance" that "reports on a person's off-duty activities just as surely as [if] someone had been present and watching." *Id.* (quoting *Capua v. City of Plainfield,* 643 F.Supp. 1507, 1511 (D.N.J.1986)); *see American Fed'n of Government Employees, AFL–CIO, Council 33 v. Meese,* 688 F.Supp. 547, 552 (N.D.Cal.1988) (urinalysis testing "enables government surveillance of employees' private, off-duty lives. This type of chemical surveillance represents a serious intrusion.")

31. 833 F.2d at 340. The court concluded that it would have been "patently irresponsible for school officials to have ignored this situation." *Id.* The court also noted that while the 60% estimate of drug usage among Branch employees may have been overstated, "even a smaller figure could be indicative of a serious drug problem." *Id.* at 340 n. 12.

32. The court noted its disagreement with the district court's attempt to draw a safety interest distinction between bus drivers and mechanics on one hand, and bus attendants on the other. The court noted that "[w]hile the safety concern may be somewhat greater for a school bus driver, it is still quite significant in the case of an employee who is responsible for supervising, attending and carrying handicapped children." *Id.* at 340.

33. *Id.* at 339. The School System did not contest that any compulsory urinalysis testing, in order to be lawful, had "to show a nexus to the employer's safety concern." *Id.* at 340.

34. Accordingly, the court does not reach the second (reasonable relationship) prong of the *Jones v. McKenzie* analysis.

Transportation Branch employees is anything but that." *Id.* at 339.

The unmistakable implication of this language is the recognition that the intrusion upon the employees' privacy interests would be far greater outside the context of such a legitimate, regular, employment related medical exam. This fact was recognized in *Amalgamated Transit Union, Local 933 v. The City of Oklahoma City*, No. 86–2182–A, slip op. at 18 (W.D.Okl. Sept. 6, 1988), where the district court discussed the intrusion on the privacy rights of employees by a urinalysis testing conducted during bona fide, employment related, regular medical examinations: "In the course of such an examination, even if it does not include urinalysis, one is called on to disclose information not generally disclosed to the public, to uncover certain parts of the body not normally displayed, and, in general, to surrender for the sake of the diagnostic purposes of the examination, [sic] some

of the reasonable expectations of privacy that one possesses in other situations."[35]

The USDA's proposed random urinalysis testing, unlike the testing in *Jones*, will not be conducted in a situation where its employees have already surrendered some of their reasonable expectations of privacy. This increased intrusion is not reduced by "the carefully designed" procedures, Deft's Mem. in Opp. at 49, for obtaining the samples because "[b]eing tapped [on the shoulder] during the work day and ordered to urinate into a container while under the close surveillance of a government representative, 'regardless of how professionally or courteously conducted, is likely to be a very embarrassing and humiliating experience.'" *AFGE v. Meese*, 688 F.Supp. at 552 (quoting *Capua v. City of Plainfield*, 643 F.Supp. 1507, 1514)).[36]

Thus, in addition to the employee's legitimate privacy interests in the analysis of the urine specimens noted in *Jones*,[37] there

**35.** The court went on to note that the medical examinations were indeed bona fide. It found that "a number of significant conditions and risk factors having nothing to do with drug usage were identified during the course of these examinations" *Amalgamated Transit Union*, slip op. at 18, — F.Supp. at —, and concluded that this information provided not related to drug use was significant to the defendant's legitimate interest in providing safe public transportation. *Id.*

**36.** *See National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175 ("There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed its performance in public is generally prohibited by law as well as social custom."), *cert. granted*, — U.S. —, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); *Harmon v. Meese*, 690 F.Supp. 65, 69 (D.D.C.) ("the highly controlled environment and the elaborate procedure designed for obtaining urine samples of an apparently law-abiding employee outside the context of a routine medical examination may be considered offensive and demeaning"), *cert. denied*, — U.S. —, 109 S.Ct. 328, 102 L.Ed.2d 345 (1988); *Patchogue–Medford Congress of Teachers v. Board of Education of the Patchogue–Medford Union Free School District*, 70 N.Y.2d 57, 517 N.Y.S.2d 456, 461, 510 N.E.2d 325, 329, 330 (1987) ("Ordering a person to empty his or her bladder and produce the urine in a container for inspection and analysis by public officials is no less offensive to

personal dignity than requiring an individual to empty his pockets and produce a report containing the results of a urinalysis examination.")

Nor, for that matter, do the advance notice provisions limit the intrusion on an employee's privacy because "[t]he whole purpose of random testing is to ... test people without them knowing it's coming." *AFGE v. Meese*, 688 F.Supp. at 552 n. 6.

**37.** The Fifth Circuit similarly noted the intrusiveness of the analysis of a urine specimen: "Urine testing may disclose ... much additional personal information about an employee— whether the employee is under treatment for depression or epilepsy, suffering from diabetes, or, in the case of a female, pregnant. *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175–76 (5th Cir.1987), *cert. granted*, — U.S. —, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988).

Plaintiff–NTEU correctly notes that an employee's privacy is invaded when he or she is required to justify their positive test results before a MRO. They point out that having to reveal confidential information to someone other than one's doctor is a significant intrusion on an employee's privacy. Pltf's Mem in Opp. at 28 n. 20. The Fifth Circuit recognized this intrusion in a continuation of the passage quoted above: "Even tests limited to the detection of controlled substances will reveal the use of medications prescribed for relief of pain or other medical symptoms." *Von Raab*, 816 F.2d at 176.

are other "strong privacy interests" at stake here.[38] Because the privacy interests implicated are stronger than those recognized in *Jones,* only correspondingly increased "significant and compelling" or "strong" government interests can justify the suspicionless urinalysis testing proposed by the USDA. The court finds the government's asserted interests of safety, security and integrity do not satisfy this heavy burden and therefore the USDA's proposed random urinalysis is not justified at its inception. *See NFFE v. Carlucci,* 680 F.Supp. at 431 ("the Fourth Amendment requires a heavy presumption against searches not based on individualized suspicion.").

In assessing the strength of the proffered governmental interests, this court finds it significant that the USDA's proposed random urinalysis testing is not in reaction to anything even remotely resembling "the drug culture" described in *Jones.* While there is considerable dispute among the parties as to the exact number of drug related incidents at the USDA in the past five years,[39] no party seriously disputes the fact that the number of drug related incidents in the past five years, whatever the actual number, is infinitesimal when compared to the number of employees at the USDA.[40] Although the existence of the "drug culture" was apparently not a *sine qua non* to the D.C. Circuit's finding that the urinalysis testing was justified at its inception in *Jones,*[41] to the extent that the evidence assisted in demonstrating a "strong" or "significant and compelling" governmental interest in implementing suspicionless urinalysis testing, this court finds no similarly compelling evidence in the case *sub judice.*

The interests identified by the defendants justifying the random urinalysis testing are not correspondingly greater than the *"serious"* governmental interest identified in *Jones.* In fact, in two of the three

**38.** Plaintiffs also challenge the efficacy of the privacy protection that safeguards this information under the program. Pltf NTEU's Mem. in Reply at 38 n. 20 (the privacy act provides criminal penalties only where disclosure was willful beyond a reasonable doubt).

**39.** According to the USDA, over the past five years 120 USDA employees were disciplined for drug related misconduct while 407 employees have been referred for *voluntary* drug treatment and rehabilitation. Deft's Mem. in Opp. at 5–6. Plaintiff NAAE contends that over 70 of these drug related misconduct incidents involved a single incident where forest service employees were disciplined for growing marijuana in the national parks. Pltf's Mem. in Resp. at 6. In addition, many of the incidents described by the USDA are undated, cryptic, and do not specifically document the extent to which illegal drug *usage* affected job performance. *See* Rector Decl. app. 1 at ¶ 3 (three mailroom clerks removed from service for selling marijuana) (date unknown); ¶ 9 (cartographic technician suspended for 60 days for off-duty sale of marijuana) (date unknown); ¶ 10 (soil conservation technician resigned in lieu of removal for hauling marijuana) (date unknown); ¶ 14 (clerk typist was terminated during probation for AWOL and failure to request leave) (drug relationship not described) (date unknown).

**40.** Even if the court were to accept the USDA's assertions as true, the number of employees involved in drug related incidents over the past five years (120) is extremely small compared to the total number of USDA employees (over 100,000 in each of the past five years). These numbers compute to a .024% figure of drug related incidents per year.

Indeed, the defendants implicitly concede the lack of drug problem at the USDA, as did the defendants before Judge Revercomb in *Harmon v. Meese,* by arguing that even without evidence of a significant problem, "it does not follow that the agency must wait until a serious problem can be documented before taking preventative measures." Deft's Mem. in Opp. at 56. *See Harmon,* 690 F.Supp. at 68 (defendants "argue strenuously" that "documentation of a 'widespread' drug abuse problem among Department employees is not an absolute prerequisite to taking action to correct or stave off potential 'disruption of the office and destruction of working relationships'"). Alternatively, the defendants argue here that "[t]he evidence of a serious drug problem nationwide is *more* than sufficient to give a particular agency reasonable concern about the potential impact of illegal drug use among its employees." Deft's Mem. in Opp. at 54. While the court concedes that drug abuse is a serious problem facing this country, this evidence hardly compares to the serious drug abuse problem inside the District of Columbia School System in *Jones.*

**41.** The D.C. Circuit found it "noteworthy" that the D.C. School System's proposed testing was prompted not only by job descriptions but also by "strong evidence of a veritable 'drug culture' among Transportation Branch employees." *Jones,* 833 F.2d at 340.

job categories at issue here, the court finds the governmental interests significantly less compelling than those presented in *Jones*. These government interests, therefore, fail to offset the increased intrusion into the legitimate expectations of privacy of the employees subject to the proposed testing. The court will consider each job category challenged separately.

Defendants argue that the USDA has a compelling interest in the security of sensitive computer-stored information at the FNS. The court finds this asserted interest inadequate to justify any from of suspicionless urinalysis testing, much less the random testing at issue here. The court notes initially that the sensitive computer information at issue here does not relate to our national security. While in no way denigrating the importance of the war against poverty, the information at issue here is of a different (and less compelling) degree entirely. The risks presented to the government, and to the public in general, from the damage or loss of some or all of this information is simply not the type of compelling risk that would justify the suspicionless intrusion proposed by the USDA.[42]

Defendants next assert that the government's interest in preserving the integrity of its drug interdiction effort justifies the random urinalysis testing of non-management PPQ officers. In support of this classification, defendants point to the "not uncommon" instances where PPQ officers find illegal drugs while performing their statutory duties.[43] The court finds this justification less compelling than the safety interest identified in *Jones*.[44]

The PPQ officers are statutorily responsible for preventing plant pests and animal diseases from entering the United States. Pursuant to this authority, they inspect cargo coming in from foreign countries aboard planes and ships as well the baggage of passengers arriving at international ports of entry. These officers are administrative employees, not law enforcement officers. They do not carry weapons and are not authorized to make arrests. They receive no training in drug identification, detection or interdiction. Furthermore, they have no drug interception responsibilities. Consistent with the relatively non-sensitive nature of their assignments, APHIS has consistently assigned these positions a zero sensitivity rating in job vacancy announcements (Form AD–332) and personnel actions (Form 50–B). Absent strong evidence of a drug problem among these employees,[45] the court finds that this interest does not justify the significant intrusion represented by the USDA's

---

**42.** In addition, the risk of massive fraud, arguably the most compelling interest to the general public, cannot be perpetrated by the computer specialists at issue here without assistance. In attempting to justify this classification, Carol Naughton, the Director of Information Resources Management at the FNS, declares that either of the two computer security officers at issue here could "use his knowledge of computer access, *in combination with an accomplice in the FNS Accounting Division,* to divert huge sums of money...." Naughton Dec. at 4. This justification is not only too attenuated to support the proposed random urinalysis testing, the government has failed to demonstrate how this particular risk is present only from drug use.

**43.** DPM Supp. app. A at 1. The defendants also contend that these employees have diminished expectations of privacy because they are required to undergo pre-employment physicals and that those officers who work in areas where health risks are high submit to regular health monitoring, including blood testing. Deft's

Mem. in Opp. at 10. The court finds that these pre-employment physicals are the garden variety type required of many government employees. The government does not direct any type of testing for drug impairment during these physicals. The regular health monitoring was initiated at the employees' insistence to protect those individuals exposed to hazardous materials. Simmons Decl. ¶ 10. The court finds that this testing is not a regular, governmentally required health screening similar to that imposed in *Jones*.

**44.** Indeed, the defendants concede that the government's interests are highest where positions involve public safety. Deft's Mem. in Opp. at 5.

**45.** While the defendants point to two drug-related incidents involving PPQ employees in the last five years, the court notes that plaintiff NAAE vigorously contests this evidence. Furthermore, two incidents do not a "drug culture" make.

proposed random urinalysis testing.[46]

Finally, defendants argue that the USDA has a compelling safety interest in ensuring that the motor vehicle operators are drug free. The court finds that this interest, in combination with the lack of any direct evidence of a drug problem,[47] is not sufficient to justify the significant, incremental intrusion on the employees' legitimate expectations of privacy. While the court recognizes the obvious interest in ensuring the safe operation of *any* motor vehicle, the court finds no reason to believe this interest is more compelling than the safety interest identified in *Jones*. First, unlike the bus operators in *Jones*, these employees are not intimately associated with the "central mission" of the USDA. While a school system's basic concern is the care and education of children, the USDA's central mission is "establishing and enforcing policies which affect every aspect of agriculture." DPM Supp. at 1.

Second, and more importantly, the tasks performed by these drivers are virtually indistinguishable from those performed by any driver on the road. The four drivers in question are responsible for operating a daily shuttle bus,[48] a mail van, and passenger cars leased from the GSA. No special license is required to operate any of the vehicles in question, nor does the USDA do any kind of a special background check or prescreening of these drivers.[49] In short, assuming without deciding that the government's interest in the safe operation of these FNS vehicles is equal to the safety interest identified in *Jones*, the court finds that government's interest here does not carry the incrementally heavier burden required to justify random urinalysis testing at its inception.[50]

The court therefore finds that the USDA's proposed random urinalysis testing is not justified at its inception. This ruling is consistent with the recent decisions of a number district courts faced with

---

**46.** The court finds the defendants' eleventh hour effort to justify this TDP classification with evidence of the "cross designation" of some 150 PPQ officers to perform "some Customs and/or Immigration and Naturalization Service (INS) duties" equally unconvincing. The question of the responsibilities of Customs or INS officers is not before this court. These respective agencies have the responsibility to determine, at least in the first instance, whether the responsibilities entailed by these job categories justify random urinalysis testing. However, those job categories and those agencies are not at issue here.

**47.** Plaintiffs NTEU asserts, and the defendants do not deny, that "no motor vehicle operator within the FNS has ever been involved in a serious accident, resulting from the use of drugs or anything else." Pltf NTEU's Mem in Supp. at 33.

**48.** The shuttle bus carries 13 people and operates on a regular schedule between 8:40 a.m. and 4:10 p.m. According to the declaration of Walter R. Jacobson, Chief of the Property Management Branch, most of the driving of the shuttle bus is now done under contract with a private driver. USDA employees regularly back-up these contract drivers. Thus, these employees are principally engaged in the other job tasks identified. Mr. Jacobson estimates that FNS motor vehicle operators transport approximately 2,000 passengers a year. Defendants reliance on cases upholding some form or urinalysis testing of public transit workers is misplaced. The court finds these cases factually distinguishable. *Cf., e.g., Transport Workers'*

*Union of Philadelphia, Local 234 v. Southeastern Pennsylvania Transportation Authority*, 678 F.Supp. 543, 545 (E.D.Pa.1988) (upholding testing of safety sensitive SEPTA transit workers, including drivers, where 350 *million* passenger rides occurred in 1986, and the *weekday average* was 1.2 *million* passengers). The average major metropolitan bus driver likely transports 500 passengers *a day* and most certainly accounts for that number in a week. Thus, the safety risks presented are significantly less compelling by these FNS drivers.

**49.** While a physical examination is required of these employees prior to being hired, this examination is conducted by the employees' own doctor. The doctor is required to complete a Standard Form 78 (Deft's Exht. 9) which sets forth the specific physical requirements for the job and asks the physician to certify that the employee meets those requirements. Contrary to defendants implication, Deft's Opp at 49 (motor vehicle operators must submit to medical examinations that "may include" urinalysis tests"), no urinalysis tests are conducted at the direction of the government. Plaintiff–NTEU asserts, and defendants do not deny, that "urine tests, chest X-rays and the like are only performed if, in the physician's discretion" they are required for the certification. Pltf–NTEU Mem. in Reply at 34 n. 26.

**50.** This finding is buttressed by the complete lack of evidence demonstrating a drug problem among these employees.

similar programs. *See Harmon v. Meese,* 690 F.Supp. 65 (D.D.C.1988) (Department of Justice's proposed random urinalysis testing in Offices, Boards and Litigation Divisions not justified at its inception); *AFGE v. Meese,* 688 F.Supp. 547 (N.D.Cal. 1988) (Federal Bureau of Prisons proposed random urinalysis testing not justified at its inception). While the court acknowledges that random drug testing might deter drug use, the fundamental values of individual liberty and privacy embodied in the Fourth Amendment cannot be sacrificed for the sake of mere efficiency.[51]

### 3. *Reasonable Suspicion Urinalysis Testing*

The plaintiffs contend that probable cause should be required before the USDA is permitted to conduct urinalysis testing of any employee within either of the represented bargaining units with the sole exception of those employees in safety sensitive positions.[52] Plaintiffs argue that as proposed, the reasonable suspicion testing is far more intrusive than any search authorized by the Supreme Court on less than probable cause and a warrant.[53] They also note that there is no requirement of *work-related* drug use or impairment in the terms defining reasonable suspicion under the USDA plan.[54]

The defendants' filings before the court do not directly address the plaintiffs' challenge to the reasonable suspicion drug testing of all employees within the respective collective bargaining units. Instead, they apparently rely on the same principles recited above, namely that the Fourth Amendment does not preclude the government, acting in its capacity as employer, from implementing a limited program of urinalysis testing to further its compelling interests in preserving safety, security, and

---

**51.** To the extent the court differs with Judge Hogan, the safety and security risks incumbent in the job categories designated for testing in *NFFE v. Carlucci* were clearly more severe and thus distinguishable from the risks presented here. Shuttle bus drivers, welfare service computer operators, and plant and animal inspectors hardly present the same *national* security and safety risks presented by air traffic controllers, airline mechanics, civilian law enforcement personnel, etc. 680 F.Supp. at 423. Judge Gesell's opinion in *AFGE v. Dole* is similarly distinguishable to the extent that the testing designated positions were air traffic controllers and airline mechanics. *See AFGE v. Dole,* 670 F.Supp. at 446 (94% of the employees subject to random testing hold positions such as air traffic controllers, electronic technicians, aviation safety inspectors and aircraft mechanics). The court also notes that Judge Gesell's opinion was issued before the D.C. Circuit's opinion in *Jones* which established the strong privacy interests required to be factored into the two prong inquiry employed above. *See also Thomson v. Weinberger,* 682 F.Supp. 829, 832 (D.Md.1988) ("the Court [Judge Gesell] rested its decision not so much on the merit of the Department's testing program as on the plaintiff's failure to provide sufficient evidentiary support for its claim").

**52.** Plaintiffs categorize this group as safety-related Testing Designated Positions. For employees in these categories, and of the positions at issue in this case only the five motor vehicle operators would be included, plaintiffs concede that a standard of "reasonable suspicion" would satisfy the strictures of the Fourth Amendment. They would require that reasonable suspicion be supported by "specific personal observations that a supervisory or managerial employee, trained and experienced in drug use detection and drug induced impairment evaluation, can articulate concerning the job performance, appearance, behavior, speech, or bodily odors of the employee." Pltf's Prop. Order at 3.

**53.** Plaintiffs point to the across the board requirement that all reasonable suspicion drug testing be conducted under direct observation and argue that this search is far more intrusive than any search authorized by the Supreme Court not on the border or in prisons, where the interest of the government are concededly higher. Pltf NTEU's Mem. in Supp. at 42 n. 33 (citing *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) and *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

**54.** Indeed, following upon this statement, plaintiffs' also argue that there has been no showing by the government that mere use of illicit drugs by employees in non-safety/sensitive positions would create an irreparable injury to the performance of the agency's mission. Pltf NTEU's mem. in Supp at 48 ("Furthermore, the government's interest in determining whether or not most employees have used illegal drugs, éven *on the job,* is not sufficiently essential to its effective and efficient operation to deprive potentially innocent employees of the protections of the warrant and probable cause standard.") (emphasis in original).

integrity.[55]

As noted above, "the standard for reasonableness applicable to a particular class of searches requires 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *O'Connor,* 107 S.Ct. at 1499 (quoting *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)).

The D.C. Circuit has applied this language on two recent occasions in finding that the standard for determining the legality of compulsory urinalysis testing of public sector employees "has two reference points: the court must determine first 'whether the [search] was justified at its inception,' *i.e.,* whether 'reasonable grounds [exist] for suspecting that the search will turn up evidence' of work related drug use, *and* second, 'whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place,"' *i.e.,* whether 'the measures adopted are reasonably related to the objectives of the search and not excessively intrusive.'" *National Federation of Federal Employees ("NFFE") v. Weinberger,* 818 F.2d 935, 943 (D.C.Cir.1987) (emphasis in original) (quoting *T.L.O.*) (citations omitted); *Jones,* 833 F.2d at 339 (quoting *T.L.O.* and *NFFE v. Weinberger* ).

The general test employed by the Supreme Court when it has used this two pronged inquiry is that "the legality of the search in question should depend simply on the reasonableness, under all the circumstances of the search." *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 743; *O'Connor,* 107 S.Ct. at 1502 ("public employer intrusions on the constitutionally protected interests of government employees ... should be judged by the standard of reasonableness under all the circumstances"). In the instances when the Supreme Court has employed this general reasonableness test followed by the two pronged inquiry, it has done so after determining that neither the warrant nor probable cause standard is appropriate given the circumstances. *See, e.g., T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 743–44 (the need for "freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause...."); *O'Connor,* 107 S.Ct. at 1502 ("special needs, beyond the normal need for law enforcement make the ... probable cause requirement impracticable").[56]

Thus, by adopting the two-pronged inquiry quoted above as the appropriate test, the D.C. Circuit has implicitly ruled that both the probable cause and warrant requirements are inappropriate in the context of mandatory urinalysis testing of public employees. While the D.C. Circuit could have been more explicit in its reasoning in reaching this result,[57] the consequences of its actions preclude this court from entertaining the plaintiffs' argument that the USDA's proposed "reasonable suspicion" urinalysis testing should instead be based on probable cause.[58]

---

**55.** Obviously, however, to the extent a search, in this case a urinalysis test, is supported by some particularized suspicion, the government's interest in conducting the search is strengthened.

**56.** Judge Hogan in *NFFE v. Carlucci,* 680 F.Supp. at 431, made a similar finding: "The Supreme Court has been guided by a twofold inquiry in determining whether a search *without a warrant or probable cause* is reasonable...." (emphasis added) (quoting the two pronged test noted above).

**57.** With only a modification in the definition of reasonable suspicion, the Ninth Circuit reached the very result that plaintiffs challenge here. In *RLEA v. Burnley,* the Ninth Circuit found that particularized suspicion is required before

government mandated drug and alcohol testing of railroad employees is justified at its inception. 839 F.2d at 587. In reaching this conclusion, the court found: 1) that a warrant was not required, *id.* at 583, 2) that a standard of "reasonableness under all the circumstances" rather than probable cause was the appropriate standard to govern the legality of the proposed testing, *id.* at 587, and 3) that particularized suspicion, and in particular reasonable suspicion was required before the drug and alcohol testing was justified at its inception. *Id.* at 586–87.

**58.** Indeed, the central dispute among the lower courts is whether *any* particularized suspicion is required to justify a search under this reasonableness test. The Supreme Court expressly declined to reach this question in both *T.L.O.,* 469

The D.C. Circuit has intimated that part of its rationale in implicitly adopting the general reasonableness standard in the context of mandatory urinalysis testing of public employees "is the arguably relaxed standard" for the government as employer. *NFFE v. Weinberger*, 818 F.2d at 943 n. 12; *see Jones*, 833 F.2d at 339 n. 9 ("[W]e are mindful that '[u]nder certain circumstances, the Government may deprive public employees of some of the rights they would have as citizens ... [because] sometimes a citizen's full enjoyment of his constitutional rights may be demonstrably incompatible with the mission of the particular public agency employing him.'") (quoting Kamisar, *Drugs, Aids and the Threat to Privacy*, N.Y. Times, Sept. 13, 1987, § 6 (Magazine), at 109, 110–11). In accordance with this rationale, the court will clarify the proposed instances justifying a determination that reasonable suspicion exists, *see supra* at 939, by providing that such testing shall be based on reasonable, articulable, and individualized suspicion that a specific employee may be under the influence of drugs while on duty. This clarification will ensure that the USDA's proposed testing is fully within "the arguably relaxed standard" for the government as an employer.[59]

### III. STANDARD FOR A PRELIMINARY INJUNCTION

In this circuit, a moving party is entitled to a preliminary injunction if that party demonstrates: 1) a likelihood of prevailing on the merits; 2) the likelihood that the moving party will suffer irreparable harm absent relief; 3) that other interested parties will not suffer substantial harm if the court grants the relief requested; and 4) that the public interest favors granting the relief sought. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977).

The court finds it likely that the plaintiffs here will prevail on the merits of their challenge to the constitutionality of the USDA's proposed random urinalysis testing. The law is well settled that the burden is on the government to show that a warrantless search is reasonable under the Fourth Amendment. 4 W. LaFave, *Search and Seizure*, § 11.2(b), at 218 (2d ed. 1987). The defendants have failed to demonstrate that the USDA's proposed random urinalysis testing program is justified at its inception.

Without the requested relief, employees in testing designated positions in the two collective bargaining units must either undergo an unconstitutional search or face immediate dismissal. The USDA will suffer no substantial harm from a preliminary injunction barring random urinalysis testing. Finally, the court finds that the public interest favors the suspension of unconstitutional searches. As Judge Revercomb noted in *Harmon*, in light of the urinalysis cases pending before the Supreme Court

U.S. at 342 n. 8, 105 S.Ct. at 744 n. 8 ("We do not decide whether individualized suspicion is an essential element of the reasonableness standard we adopt today...."), and *O'Connor*, 107 S.Ct. at 1503 ("[W]e need not decide whether individualized suspicion is an essential element of the standard of reasonableness we adopt today."). The court therefore finds that most of plaintiffs' arguments are more appropriately directed to the D.C. Circuit.

59. The court notes finally that the result reached here conforms with the results reached by two other district courts faced with challenges to the constitutionality of a government agency's proposed urinalysis testing program. Both judges rejected the random testing but allowed agency wide "reasonable suspicion" testing to go forward. *AFGE v. Meese*, 688

F.Supp. 547 (N.D.Cal.1988) (enjoining Federal Bureau of Prisons random drug testing; permitting testing of any Bureau employee where reasonable suspicion exists that drug use by that employee impairs his or her ability to perform official duty); *Hansen v. Turnage*, No. 88–30261 (N.D.Cal. July 28, 1988) [1988 WL 147881] (enjoining Veterans Administration's random urinalysis testing; denying injunction of reasonable suspicion urinalysis testing pending further briefing); *Hansen v. Turnage*, No. 88–32061 (N.D.Cal. Sept. 12, 1988) [1988 WL 147884] (permitting reasonable suspicion testing of any employee based on "reasonable suspicion of on-duty, drug use or drug related impairment supported by specific, personal observations that a supervisory or managerial employee can articulate concerning the job performance, appearance, behavior, speech, or bodily odors of the employee....").

and the D.C. Circuit, the public interest will be "well served" by the maintenance of the status quo in this limited instance.

The court finds, however, that the plaintiffs have demonstrated neither "a likelihood of success on the merits" nor "a serious legal question going to the merits" under *Population Institute v. McPherson,* 797 F.2d 1062, 1078 (D.C.Cir.1986) in their constitutional challenge to the USDA's proposed "reasonable suspicion" urinalysis testing program, as clarified by the court's accompanying order. As such, the court declines to preliminarily enjoin the USDA's proposed "reasonable suspicion" urinalysis testing.

## IV. REMAINING CLAIMS AND MOTIONS

The Plaintiffs have also challenged the USDA's proposed urinalysis testing program under the Civil Service Reform Act of 1978 and the Rehabilitation Act of 1973. The defendants have moved to dismiss both of these claims under Fed.R.Civ.Pro. 12. In light of the court's ruling above modifying the USDA's proposed urinalysis testing program, the court denies these motions without prejudice to their subsequent resubmission. The parties are directed to consider the effect of today's ruling on each of these claims and to reassert those that remain viable.[60]

Finally, two nettlesome issues have been raised by the "proposed order" submissions of the parties. Plaintiff NTEU included in its proposed order a paragraph that would enjoin the USDA from conducting post-accident testing of employees within the represented bargaining units "unless there exists reasonable grounds to believe that because of illegal drug use the employee caused the incidents enumerated therein." The court finds this paragraph troubling for a number of reasons not the least of which is that this is the first mention of any challenge to post-accident testing raised in this case. If it is indeed plaintiff-NTEU's intention to challenge this provision, the issue must be fully briefed by both sides.

The defendants proposed order makes no direct reference to its standing objections despite the inclusion of the following heading in their reply brief filed on the date of the hearing on the various motions: "PLAINTIFF UNIONS HAVE ASSOCIATIONAL STANDING TO SUE ONLY ON BEHALF OF THEIR MEMBERS *AFFECTED* BY THE PLAN." Deft's Reply at 3 (emphasis added). While the court has assumed that defendants have waived their objections to NTEU's standing to challenge the random urinalysis of the computer operator positions, *see supra* n. 3, the court is frankly confused as to the status of defendants' objection with respect to plaintiffs' challenge to the USDA's proposed applicant testing provisions.

■ The court notes that in the only direct challenge to applicant testing provisions brought to its attention, the Fifth Circuit noted that "[b]ecause no applicant for initial·employment is a party to this suit, we consider the constitutionality of the program only as it applies to current employees seeking transfer." *National Treasury Employees Union v. Von Raab,* 816 F.2d 170, 173 (5th Cir.1987), *cert. granted,* ——— U.S. ———, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988). While the court is concerned about the proposed urinalysis testing of applicants for the reasons set forth above, it is equally concerned about the standing of the plaintiffs to raise this objection. Accordingly, the court will deny that part of the plaintiffs' motion seeking to enjoin the USDA from conducting applicant testing pending clarification of the issue by both sides in light of today's opinion.

## V. CONCLUSION

For the reasons set forth above, the court will enter a preliminary injunction against the USDA's proposed random urinalysis testing program. The court will deny that part of plaintiffs' motion for an injunction of the USDA's proposed "reasonable suspicion" urinalysis testing provided that such testing is modified as speci-

---

**60.** This same result applies to Plaintiff NAAE's argument that the proposed urinalysis testing program violates the Administrative Procedures Act.

fied in the accompanying order. Finally, the court will deny that part of plaintiffs' motion for an injunction of the USDA's applicant testing pending further clarification of the issue by both sides. An appropriate order accompanies this opinion.

## ORDER

Upon consideration of the plaintiffs' motion for a preliminary injunction, the defendants' motion for summary judgment, the respective oppositions and replies filed by the parties, the entire record herein, and for the reasons set forth in the accompanying memorandum opinion, it is by the court, this 8th day of December, 1988,

ORDERED that the plaintiffs' motion for a preliminary injunction is granted in part and denied in part; and it is further

ORDERED that defendants are enjoined from conducting proposed random urinalysis testing as set forth in the United States Department of Agriculture's Department Personnel Manual Supplement 792–3 ("DPM Supp. 792–3") for the testing designated positions within the collective bargaining units represented; and it is further

ORDERED that plaintiffs' motion for a preliminary injunction enjoining defendants from conducting proposed "reasonable suspicion" drug testing as set forth in DPM Supp. 792–3 is denied provided that such testing of employees within the collective bargaining units represented is based upon reasonable, articulable, and individualized suspicion that a specific employee may be under the influence of drugs while on duty; and it is further

ORDERED that the remaining provisions of plaintiffs motion for a preliminary injunction of other provisions of the USDA's proposed urinalysis testing, namely provisions for post-accident and applicant testing, are denied; and it is further

ORDERED that the defendants' motion for summary judgment and their motion for dismissal of various counts of the plaintiffs' complaint are denied.