**Mark B. HARMON, et al., Plaintiffs,**

v.

**Edwin MEESE III, Attorney General of the United States, and Harry H. Flickinger, Assistant Attorney General, Defendants.**

Civ. A. No. 88–1766.

United States District Court,
District of Columbia.

July 29, 1988.

Stephen H. Sachs, Carl Willner, Stephen M. Cutler, Wilmer, Cutler & Pickering, Arthur Spitzer, Elizabeth Symonds, American Civil Liberties Union, Washington, D.C., for plaintiffs.

John R. Bolton, Asst. Atty. Gen., Robert J. Cynkar, Mary E. Goetten, Peter Robbins, Brooke Hedge, U.S. Dept. of Justice, Washington, D.C., for defendants.

### MEMORANDUM OPINION AND ORDER

REVERCOMB, District Judge.

This matter is before the Court upon plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss and for summary judgment.

Plaintiffs are forty-two employees of the Department of Justice who seek to enjoin implementation of the Department's "Drug Free Workplace Plan" in the Offices, Boards and Litigating Divisions of the Department. Under the plan, plaintiffs would be selected at random and ordered to produce urine specimens in order to permit the Department to ascertain whether they illegally use drugs. Plaintiffs contend that subjecting them to compulsory urinalyses without any suspicion of illegal drug use would violate their fourth amendment right to be free from unreasonable searches and seizures. Defendants, the Attorney General of the United States and the Assistant Attorney General for Administration, contend that the urinalyses to be conducted under the plan would constitute reasonable searches and therefore would not violate the fourth amendment.

The Department's drug testing program was created pursuant to Executive Order 12564, issued by President Reagan on September 15, 1986, which directed the head of each executive agency to develop plans to test all employees in "sensitive positions" for drug abuse in order to combat the "serious adverse effects [of drug use] upon a significant proportion of the national work force [which] results in billions of dollars of lost productivity each year." 51 Fed.Reg. 32,889. In accordance with this presidential directive, Attorney General Meese unveiled the "Department of Justice Drug-Free Workplace Plan" on September 25, 1987 (amended December 17, 1987) (the "DOJ Plan"), authorizing testing of, among others, all employees with less than one year's service ("probationary employees")

holding sensitive positions and all employees in sensitive positions designated for drug testing ("testing designated positions or TDPs"). On December 15, 1987, defendants issued the Drug Free Workplace Plan (the "OBD Plan") of the Offices, Boards and Litigating Divisions of the Department of Justice. On June 27, 1988, defendants issued OBD Order 1792.1, giving notice of the implementation of the OBD Plan. All procedural hurdles have thus been cleared, and drug testing may commence in accordance with the OBD Plan as soon as August 26, 1988.

The OBD Plan calls for random testing of seven percent of all employees in testing designated positions, and mandatory testing of all probationary employees holding testing designated positions and all individuals tentatively selected for employment. The testing would seek evidence of use of marijuana, cocaine, opiates, amphetamines and phencyclidine. Employees would be selected for testing by neutral selection criteria, such as social security numbers. Disciplinary action would be initiated against any employee who tested positive or refused to be tested. Such disciplinary action could take various forms, including dismissal, suspension, removal from duty from a sensitive position, or reprimand. The employee would also be referred to a rehabilitation program. After an employee has once been found to use illegal drugs, dismissal would be mandatory if that employee refused to obtain rehabilitation or tested positive for drug use a second time.

Testing designated positions are determined according to criteria enumerated in the DOJ Plan. The factors include the extent to which a DOJ component "[c]onsiders its mission inconsistent with illegal drug use" or "[m]ust foster public trust by preserving employee reputation for integrity, honesty and responsibility." DOJ Plan at 17. Also considered significant are whether in a particular position an employee carries firearms, deals with "sensitive" information, engages in law enforcement or in "activities affecting public health or safety"; is involved in the prosecution of criminal cases; or has access to grand jury proceedings. *Id.* at 17–18. The OBD Plan

has designated for mandatory random testing all applicants tentatively selected for employment, all employees with top secret security clearances, all attorneys and support staff involved in conducting grand jury proceedings, all presidential appointees, all employees who prosecute criminal cases, and all employees whose duties include maintaining, storing or safeguarding controlled substances.

Appendix A to the OBD Plan lists testing designated positions within various OBD offices and the reasons why those positions within the particular office merit drug testing. Positions deemed "sensitive" and designated for testing include, for example, the chief, economists, financial analysts, mathematical statisticians, financial assistants, social science analysts, and secretaries within the Antitrust Division's Economic Litigation Section. A description of the incumbents' duties indicates that they "analyze and advise on all economic issues that arise in Division cases and investigations, merger reviews, regulatory agency proceedings, and legislative matters." The positions are designated for drug testing because:

> Impaired judgment and performance due to illegal drug use could result in a failure to consider adequately the economic implications of Division positions and actions, which could lead to higher prices, lower quality of goods and services, and lessened competitiveness of American businesses in world markets. Drug usage could also result in mishandling of Top Secret, grand jury, and other sensitive information, jeopardizing existing investigations and compromising both the integrity of the criminal enforcement process and national security.

OBD Plan, appendix A. Similar rationales are expressed for designating positions for drug testing within other sections of the Antitrust Division.

Similarly, trial attorneys in the Appellate Section of the Civil Rights Division are designated for drug testing because:

> Illegal drug use by incumbents could constitute a serious breach of public trust and could compromise decisions re-

garding litigation and legislation, resulting in a negative effect on the overall success of the program.

*Id.*

Employees selected for providing urine samples would be required to follow procedures that would be "as non-intrusive as possible." Memorandum of Law in Support of Defendants' Motion to Dismiss at 23. The employee who had been selected for random testing would report to a collection site. After showing photo identification, removing outer garments and washing hands, the employee would be directed to a rest room stall and required to produce a urine specimen of at least 60 milliliters. The employee would not be watched unless the collection monitor had reason to believe the employee might alter or substitute the specimen. After the sample had been taken, the collection monitor, in the presence of the employee, would transfer the sample to a bottle and measure its temperature to ascertain that the sample had not been altered or substituted. An identification label with the employee's fingerprint and identification number would be placed around the bottle. The employee would then sign a log book which in turn would be initialed by the collection monitor. Strict chain of custody procedures would be in place to ensure accuracy of the test results. The sample would be transported to a laboratory meeting strict quality control guidelines. Samples that initially tested positive under a Radio–Immuno–Assay test would be retested by the more exacting gas chromatography/mass spectrometry technique, which is the most reliable indicator of the presence of drug metabolites in urine. The government concedes, however, that neither technique can measure current impairment, but rather can detect only whether the subject has used drugs relatively recently.

■ The Court agrees that drug abuse by federal employees is intolerable and that defendants' efforts to eradicate drugs from the federal workplace are well intentioned. It is the means defendants propose to achieve this laudable end that give the Court grounds for pause. Quite simply,

the issue "is not *whether* drug use, off-duty or on-duty is incompatible with federal employment. Rather, the question is *by what means* it is permissible to come by evidence of such drug use." *American Federation of Government Employees v. Weinberger*, 651 F.Supp. 726, 735 (S.D.Ga. 1986) (emphasis in original).

Compulsory urinalysis of a public employee is a "search and seizure" because it infringes on a legitimate expectation of privacy. *Jones v. McKenzie*, 833 F.2d 335, 338 (D.C.Cir.1987); *National Federation of Federal Employees* ("NFFE") *v. Weinberger*, 818 F.2d 935, 942 (D.C.Cir.1987); *NFFE v. Carlucci*, 680 F.Supp. 416, 430 (D.D.C.1988), *stayed pending appeal*, No. 88–5080 (D.C.Cir. Mar. 30, 1988); *American Federation of Gov't Employees v. Dole*, 670 F.Supp. 445, 447 (D.D.C.1987), *appeal docketed*, No. 87–5417 (D.C.Cir. Dec. 11, 1987). By its terms, the fourth amendment requires that governmental searches and seizures be reasonable. The reasonableness of a search depends upon the context in which it takes place. *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). For example, to be reasonable, a public employer's search of his employee's desk and files need not be based upon a search warrant and probable cause, but requires "reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct." *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 1503, 94 L.Ed.2d 714 (1987). Determining whether a search is reasonable requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *NFFE v. Weinberger*, 818 F.2d at 942, *quoting O'Connor v. Ortega, supra*, 107 S.Ct. at 1499; *T.L.O., supra*, 469 U.S. at 341, 105 S.Ct. at 742. A search is reasonable if it "was justified at its inception" and if "the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 742.

In the context of public employer drug testing, a search is justified at its inception when " 'reasonable grounds [exist] for suspecting that the search will turn up evidence' of work-related drug use." *NFFE v. Weinberger, supra,* 818 F.2d at 943, *quoting T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742. Defendants concede that illegal drug use is not a problem in the Department of Justice. Therefore, it is highly unlikely that compulsory random urinalysis drug testing of otherwise trusted and apparently law-abiding employees would turn up evidence of work-related drug use. Under the first prong of the test articulated by the Supreme Court and this Circuit, this Court concludes that the searches proposed in this case would not be justified at their inception.

Defendants, however, argue strenuously that compelling governmental interests justify the compulsory random urinalysis drug testing contemplated under their program. They contend that documentation of a "widespread" drug abuse problem among Department employees is not an absolute prerequisite to taking action to correct or stave off potential "disruption of the office and destruction of working relationships." Defendants' Memorandum at 56 (citing *Connick v. Myers,* 461 U.S. 138, 151–52, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983) (upholding public employer's restrictions on assistant district attorney's right to comment on matters of primarily private concern which supervisor reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships in the office)). Defendants argue that the Department has "critical" interests in its employees' fitness for duty, in the security of sensitive and classified information, and in the integrity and public image of the Department. According to defendants, these compelling governmental interests justify the intrusion of compulsory random urinalysis drug testing upon plaintiffs' concededly legitimate expectation of privacy, especially given the fact that the drug problem in society at large has assumed "crisis" proportions.

Certainly, defendants have an interest in any illegal drug use by plaintiffs. However, something more than unfounded fears must justify an intrusive search. Even though a relaxed "reasonableness" standard applies to a search by the government as an employer, such a search must be for a noninvestigatory and work-related purpose. *O'Connor v. Ortega, supra,* 107 S.Ct. at 1503. Moreover, individualized suspicion is "usually a prerequisite to a constitutional search or seizure.... Exceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal." *T.L.O., supra,* 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8. Because "strong privacy interests are involved," *Jones v. McKenzie, supra,* 833 F.2d at 339, defendants must demonstrate a "compelling need of the government as employer [to] dispens[e] with the requirement." *NFFE v. Carlucci, supra,* 680 F.Supp. at 431. Even according considerable weight to the governmental interests identified as compelling does not help defendants, because there is no nexus between fitness for duty, security and integrity on the one hand, and compulsory random urinalysis drug testing on the other, where no drug problem is believed to exist.

An example of the required nexus is provided by *Jones v. McKenzie, supra,* in which the Court upheld compulsory drug testing as part of routine medical examinations of public employees involved in the transportation of young schoolchildren where such employees had repeatedly been involved in "incidents of bizarre or dangerous drug-related behavior, ... syringes and bloody needles were found in restrooms used by Transportation Branch employees," and according to one estimate "60% of the employees assigned to the Transportation branch [used] narcotics to some extent." 833 F.2d at 336. *Compare id. with Lovvorn v. City of Chattanooga,* 846 F.2d 1539, 1547 (6th Cir.1988) ("[b]ecause there was not any evidence of a widespread or significant drug problem within the City of Chattanooga's Fire Department, the potential gains to society of initiating mandatory drug testing are significantly lower than would have been the case if there had been

evidence of a systemic drug problem;" reasonableness of mandatory drug test of firefighters requires evidence either of significant department-wide drug problem or individualized suspicion).

This Circuit has held that compulsory urinalysis constitutes a significant infringement of plaintiffs' legitimate expectation of privacy. *Jones v. McKenzie, supra,* 833 F.2d at 339–340. For one thing, the highly controlled environment and the elaborate procedure designed for obtaining urine samples of an apparently law-abiding employee outside the context of a routine medical examination may be considered offensive and demeaning. *See Railway Labor Executives' Ass'n* ("RLEA") *v. Burnley,* 839 F.2d 575, 586 (9th Cir.1988) (urinalysis resembles intrusion posed by body cavity searches because offensive to human dignity and degrading), *cert. granted,* —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *AFGE v. Meese,* 688 F.Supp. 547, 551–52 (N.D.Cal.1988) ("[b]eing tapped during the work day and ordered to urinate into a container while under the close surveillance of a government representative, 'regardless of how professionally or courteously conducted, is likely to be a very embarrassing and humiliating experience'") (*quoting Capua v. City of Plainfield,* 643 F.Supp. 1507, 1514 (D.N.J.1986)). Moreover, other strong privacy interests are implicated in drug testing. "Because drug tests often furnish information about employee activities occurring outside of working hours, such tests may provide Government officials with a periscope through which they can peer into an individual's behavior in her private life, even in her own home." *Jones v. McKenzie, supra,* 833 F.2d at 339.

The government's first asserted interest—that of ensuring fitness for duty—is severely weakened by the fact that urinalysis does not measure an employee's current impairment. Where there is no relationship between what a search is expected to produce and the governmental interest asserted to support the search, the search cannot be justified. *E.g., NFFE v. Carlucci, supra,* 680 F.Supp. at 433–34; *AFGE v. Meese, supra,* at 553–54; *RLEA v. Burnley, supra,* 839 F.2d at 588. Since compulsory random urinalysis drug testing of the Department's employees would not prove that an employee is currently impaired, the governmental interest in the fitness of its employees for duty is not greatly served by such drug testing.

This reasoning applies equally to the government's argument that compulsory random urinalysis drug testing would have a deterrent effect upon illegal drug use among Department employees. There is simply no nexus between what the search is expected to produce and the governmental interest. The defendants' justifications for testing incumbents within each section of the Offices, Boards and Divisions of the Department of Justice portray an alarming picture of what *could* happen if an incumbent abused drugs. Fortunately, defendants have "no reason to believe that drug use is widespread in the Department of Justice." Department of Justice Drug Testing Program: What You Need to Know at 9. Given that defendants do not consider drug abuse to be widespread within the Department, however, it is impossible to argue that mandatory random urinalysis drug testing serves the purpose of deterring illegal drug use by trusted and apparently law-abiding employees. In other words, defendants cannot claim a compelling governmental interest in deterring something that poses no threat and therefore does not need to be deterred.

The government also asserts a "critical" interest in the security of sensitive and classified information and in the "integrity" and "public image" of the Department. The Court agrees that these are important interests. Again, however, there is simply no nexus between what the search is aimed at uncovering and the asserted governmental interests. Given the absence of a drug problem at the Department, it is difficult to see how security of sensitive information, or the integrity and public image of the Department would be much served by requiring compulsory random urinalysis drug testing of trusted and apparently law-abiding employees, all of whom have passed rigorous background investigations into

their character and integrity, and many of whom have received high awards for their distinguished public service.

Many other conceivable forms of misconduct by plaintiffs *could* be harmful to the compelling governmental interests defendants assert. For example, an employee might embezzle, obstruct justice, or accept bribes. Such acts would clearly harm the integrity and public image of the government, yet no one could seriously argue that, absent any grounds to suspect misconduct, defendants would be justified in tapping that employee's telephone, censoring his mail or searching his home.

█ Plaintiffs have shown a strong likelihood of success on the merits of their claim that compulsory random urinalysis drug testing as proposed in defendants' drug testing program is an unreasonable search and seizure that violates the fourth amendment. The balance of equities favors maintaining the status quo. Because the Court has concluded that compulsory random urinalysis drug testing of plaintiffs would violate the fourth amendment, plaintiffs would suffer harm if the injunction were not granted. Defendants have no urgent need to implement their program by August 26, 1988, and would, at most, be inconvenienced by postponement of the program should the Court ultimately rule in defendants' favor. Another reason for maintaining the status quo is that the Supreme Court has agreed to review two drug testing cases. *NTEU v. von Raab*, 816 F.2d 170 (5th Cir.1987), *cert. granted,* — U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); *RLEA v. Burnley*, 839 F.2d 575 (9th Cir.1988), *cert. granted,* — U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (U.S. June 7, 1988). The Supreme Court's decision in those cases will likely control the ultimate disposition of this case. Based upon what has been stated, the Court also concludes that the public interest is well served by preliminary injunction. In sum, all criteria for issuance of a preliminary injunction have been satisfied. *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958); *Washington Metropolitan Transit Comm'n v.*

*Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C.Cir.1977). The Court shall issue an Order accordingly. Defendants' motion to dismiss and for summary judgment is DENIED.

## ORDER

In accordance with the Memorandum issued this 29th day of July, 1988, it is hereby

ORDERED, that plaintiffs' motion for a preliminary injunction is GRANTED. Until further order of this Court, defendants are enjoined from implementing mandatory random drug testing by urinalysis in the Offices, Boards and Litigating Divisions of the Department of Justice under the "Department of Justice Drug–Free Workplace Plan."

## ORDER

Upon consideration of defendants' oral motion to make permanent the preliminary injunction issued by the Court this 29th day of July, 1988, and the lack of opposition thereto, it is hereby

ORDERED, that the motion is GRANTED, and that the preliminary injunction be made permanent.

## ORDER

Upon consideration of defendants' motion to stay the preliminary injunction issued by the Court this 29th day of July, 1988, it is hereby

ORDERED, that the motion is DENIED for the reasons stated by the Court in its bench ruling.