Patricia S. **BANGERT**, et al., Plaintiffs,

v.

Donald P. **HODEL**, Defendant.

**NATIONAL FEDERATION OF FEDERAL EMPLOYEES, et al., Plaintiffs,**

v.

Donald P. **HODEL**, Defendant.

Civ. A. Nos. 88–3549 (HHG), 88–3518 (HHG).

United States District Court, District of Columbia.

Jan. 30, 1989.

**644**

William A. Bradford, Jr., Craig A. Hoover, Hogan & Hartson, Washington, D.C., for plaintiffs Bangert, et al.; Helene O. Cobb, Thomas L. McGovern, III, Elisa C. Massimino, Emily E. Moskowitz, Hogan & Hartson, Arthur B. Spitzer, Elizabeth Symonds, American Civ. Liberties Union Fund of the Nat. Capital Area, Washington, D.C., of counsel.

H. Stephan Gordon, Gen. Counsel, Alice L. Bodley, Deputy Gen. Counsel, Jeffrey Sumberg, Staff Atty., Natl. Federation of Federal Employees, Washington, D.C., for plaintiffs in Natl. Federation of Federal Employees.

John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Mary E. Goetten, Susan K. Rudy, Attys. Civ. Div., Federal Programs Branch, U.S. Dept. of Justice, Washington, D.C., for defendant; Arthur E. Gary, Attorney–Adviser, Div. of General Law, Office of the Sol., U.S. Dept. of the Interior, Washington, D.C., of counsel.

## OPINION

HAROLD H. GREENE, District Judge.

These actions[1] challenge aspects of a drug testing program of the United States

---

1. Plaintiffs in Civil Action No. 88–3549 are nine Department of Interior employees who challenge random and reasonable suspicion testing both on behalf of themselves and a class of similarly situated Interior Department employees. The named plaintiffs are two assistant solicitors, two park rangers, two park superintendents, a division chief, a control room operator, and a personnel officer.

Plaintiffs in Civil Action No. 88–3518 are the National Federal of Federal Employees (NFFE), which represents substantial numbers of employees within the Interior Department; NFFE's Council of Bureau of Indian Affairs Consolidated Locals, which is the exclusive bargaining representative of some 12,000 professional and non-professional employees of the Interior Department's Bureau of Indian Affairs; and three individual teachers within the Bureau of Indian

Department of the Interior. Plaintiffs in both lawsuits seek to enjoin random urinalysis testing, and plaintiffs in *Bangert* seek additionally to enjoin what is called reasonable suspicion testing. These programs are described in Part I, *infra*.

The legal principles which govern the validity of such programs are well known, having been laid out fully and fairly by my colleagues, Judges Flannery,[2] Revercomb,[3] and Hogan,[4] applying the analytical framework established in *Jones v. McKenzie*, 833 F.2d 335, 338–39 (D.C.Cir.1987), and *National Federation of Federal Employees v. Weinberger*, 818 F.2d 935, 942–43 (D.C. Cir.1987). These principles are considered, albeit not at great length because of their familiarity, in Part II, *infra*. Part III briefly discusses the government's standing and class action arguments in relation to the random testing aspect of the suit. Part IV deals with the discrete and less expansive "reasonable suspicion" part of the program; and in Part V, the Court discusses some of the broader issues raised by a program such as that under consideration here.

## I

The drug testing program of the Department of the Interior stems from Executive Order 12,654, 51 Fed.Reg. 32,889 (1986), issued in 1986. That Order requires federal agencies to develop and implement plans to achieve a drug-free workplace by, among other means, the testing of their employees for illegal drug use.

Pursuant to that authority, the Department, on December 17, 1987, promulgated its "Drug Free Workplace Policy and Pro-

cedures" (hereinafter plan or Department plan). Under this plan, the Secretary identified those positions deemed sufficiently sensitive to warrant "random urinalysis testing" for five specified drugs.[5] The plan also includes "reasonable suspicion" urinalysis testing based on a non-exclusive list of five criteria.[6]

The random testing plan identifies sensitive positions as those "characterized by critical safety or security responsibilities as related to the mission of the Department." Department plan, Part II, section .8C. According to the Department, these are positions that "directly and immediately relate to public health and safety, the protection of life and property, law enforcement, or national security." *Id.* Fully one-quarter of the Department's employees were determined to be in sufficiently sensitive positions to warrant random testing.[7]

On July 5, 1988, the Department's employees were given notice that testing would begin no earlier than in sixty days. Those in the positions subject to random testing were to be given an additional thirty-day notice before their testing would begin. Random testing was slated to start in Washington, D.C. and in Denver, Colorado on January 9, 1989, and in other areas on March 1, 1989, but due to the pendency of this action, the government agreed to withhold all random testing until January 31, 1989. The Department planned to implement reasonable suspicion testing on October 1, 1988, but to date no one has been tested under this aspect of the program.

Once random testing begins, approximately fifteen percent of the workers in the various designated positions will initial-

Affairs. Both the NFFE and its Council sue in their own capacity and on behalf of their members.

2. *The Uniformed Division Officers Association v. Brady*, Civil Action No. 88–3377, slip op. (D.D.C. Dec. 23, 1988) [1988 WL 142378]; *National Treasury Employees Union v. Lyng*, 706 F.Supp. 934 (D.D.C.1988).

3. *Harmon v. Meese*, 690 F.Supp. 65 (D.D.C. 1988), *appeal docketed*, No. 88–5265 (D.C.Cir. Aug. 11, 1988).

4. *National Federation of Federal Employees v. Carlucci*, 680 F.Supp. 416 (D.D.C.1988), *appeal docketed*, No. 88–5080 (D.C.Cir. March 16, 1988); *NFFE v. Carlucci*, 690 F.Supp. 46 (D.D.C. 1988).

5. Under the Department's plan, employees will be tested, at a minimum, for marijuana, cocaine, opiates, amphetamines, and phencyclidine (PCP).

6. *See* Part IV, *infra*.

7. Secretary's Message, November 16, 1986.

ly be chosen,[8] essentially by lottery, on the basis of their social security numbers. An employee selected for random testing will be notified on the day of testing, preferably within two hours of the test.

A positive test result leads to disciplinary action, ranging from a reprimand to dismissal. Additionally, an employee testing positive will be immediately removed from his position, if it is a sensitive position as defined by the plan, and referred to the Department's drug counselling and treatment program. Refusal to proceed to counseling may likewise lead to dismissal.

The testing procedures themselves are governed by guidelines promulgated by the Department of Health and Human Services.[9] These procedures operate as follows.

An employee selected for random testing must proceed to a designated private site or a restroom stall in the company of a collection site monitor. Upon entering the restroom, the employee must remove any unnecessary outer garments that might conceal items or substances that could be used to tamper with the specimen. The employee must then wash his or her hands before urinating and remain in the restroom or collection site throughout the collection process. During this period, the employee will be denied any further access to water fountains, faucets, soap dispensers, and cleaning agents. As a security measure, the collection site monitor places "bluing" agents in the tank water and bowl of the toilet that the employee will use. The collection site monitor then remains close by, listens to the urination, and notes any "unusual behavior" while the employee is urinating. The employee is instructed not to flush the toilet until the urine specimen is turned over to the collection site person.

As soon as the employee hands over the specimen, the monitor determines whether there is a sufficient amount of urine in the container (at least sixty milliliters), and if there is not, the employee may be required to drink liquids and urinate again. The monitor also measures the temperature of the urine, and he inspects it for signs of contaminants. If the temperature falls outside an established range, the employee must urinate once more, this time under direct observation to provide another specimen.

When the monitor has reason to believe that an employee has tampered or may tamper with the specimen, he may, once again, require that individual to urinate, but this time under direct visual observation.[10] All employees tested on the basis of reasonable suspicion must also urinate under the visual observation of a monitor. Department plan, Part II, section .3.

II

Courts must weigh four factors in considering a motion for preliminary injunction: (1) the likelihood that plaintiffs will succeed on the merits; (2) the threat of irreparable harm to plaintiffs if the injunction is not granted; (3) the possibility that the defendants and others will suffer substantial harm in the event that injunctive relief is issued; and (4) the interest of the public. *Washington Metropolitan Area Transit Commission v. Holiday Tours*, 559 F.2d 841, 843 (D.C.Cir.1977). Consideration of these factors leads the Court to conclude that a preliminary injunction against random drug testing should be issued.[11]

Two bedrock principles are clearly established and could not be disputed.

---

8. It is not clear when others will be tested, and at what intervals employees once tested will be tested again.

9. United States Department of Health and Human Services, Mandatory Guidelines for Federal Workplace Drug Testing Programs, 53 Fed. Reg. 11,970 (April 11, 1988).

10. Supervisory authorization is required for this particular repeat performance.

11. Depending upon the injury factors, an injunction could be granted even if the case raises only a serious legal question going to the merits. *Population Institute v. McPherson*, 797 F.2d 1062, 1078 (D.C.Cir.1986). In view of the decisions issued in recent months regarding the validity of the testing program (*see* note 13, *infra*), no one could reasonably deny that serious legal questions are presented.

First, urinalysis testing constitutes a search within the meaning of the Fourth Amendment. *National Federation of Federal Employees v. Weinberger,* 818 F.2d 935, 942 (D.C.Cir.1987). Second, "[i]ndividuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer." *O'Connor v. Ortega,* 480 U.S. 709, 717, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

These propositions of course merely mark the beginning of the analysis, for the Fourth Amendment only bars unreasonable searches, *NFFE v. Weinberger,* 818 F.2d at 942, and the question therefore must be considered whether the drug testing program is reasonable. A determination of the applicable standard of reasonableness requires a "balanc[ing of] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *O'Connor, supra,* 480 U.S. at 719, 107 S.Ct. at 1499.

Rules have also been established for this balancing. The Court of Appeals for this Circuit held in *Weinberger, supra,* that on one side of the balance are the employee's reasonable expectations of privacy which society is "prepared to recognize as legitimate." 818 F.2d at 942 (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 338, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985)). On the other side lie the government's interests in the "efficient and proper operation of the workplace." *Id. Weinberger* further instructs the district courts that the balancing inquiry has two reference points:

the court must determine first whether the [search] was justified at its inception, *i.e.,* whether reasonable grounds [exist] for suspecting that the search will turn up evidence of work-related drug use, and second, whether the search as actually conducted was reasonably related in scope to the circumstances which justi-fied the interference in the first place, *i.e.,* whether the measures adopted are reasonably related to the objectives of the search and not excessively intrusive (citations omitted).

818 F.2d at 943.

■ In the view of this Court, the Interior Department's random drug testing program entirely fails the first prong of this test for, as will now be demonstrated, no "reasonable grounds exist for suspecting that the search will turn up evidence of work-related drug use," except only by the remotest play of chance.

The government's own figures confirm that illegal drug use is virtually non-existent within the Department of the Interior. The Department has listed 41 employees, out of a workforce of around 70,-000, as having been identified and treated for illegal drug use in 1988, and in the preceding five years, the Department reported a comparable total of 217 employees, or 44 per year, as having received such treatment.[12] Beyond that, there has been no showing that any of these employees are in the "sensitive" positions targeted for random testing. Finally, the Department could not point to any drug-related accidents or incidents within the Department.

The government nonetheless argues that random testing is justified by its compelling interest in safety, security, integrity, and confidence in the federal workplace. While the goals are certainly laudatory, they do not justify a significant intrusion into an employee's privacy, particularly when there is absolutely no showing that drug use exists that is impairing the routine functions, let alone the critical responsibilities, of the Department. The situation appears to be not much different in other large government agencies, and it is not surprising, therefore, that justifications such as those offered here have generally been rejected by the courts, absent some showing of an actual drug problem or of individualized suspicion of drug use.[13]

**12.** Defendant's Memorandum in Opposition to [Bangert's] Motion for Preliminary Injunction at 6. Even these figures may overstate the degree of illegal drug usage since it is likely that some of these individuals received treatment more than once.

**13.** *See, e.g., Harmon,* 690 F.Supp. at 70 (Justice Department's critical interest in employees' fit-

Where testing has been upheld, it has in the main been in the context of significant, even overwhelming security and safety interests. Thus, in *Uniformed Division Officers Association Local 17 v. Brady*, Civil Action No. 88–3377 (D.D.C.1988), Judge Flannery, who had previously rejected the validity of testing as applied to the employees of the Department of Agriculture, refused to enjoin testing of the uniformed division of the Secret Service, on the basis that "[t]hese officers are part of a law enforcement organization vested with arguably the single most important responsibility of any government agency—the protection of the President and Vice President of the United States." [14]

The government's interest was also found to be especially compelling in *American Federation of Government Employees v. Dole*, 670 F.Supp. 445 (D.D.C.), appeal docketed, No. 87–5417 (D.C.Cir. Dec. 11, 1987), where testing was upheld for Transportation Department employees, ninety-four percent of whom held aviation-related positions, such as air traffic controllers, electronic technicians, aviation safety inspectors, and aircraft mechanics. [15] *Id.* at 446. [16]

The Interior Department can point to no compelling governmental interests similar to these. To be sure, some of the covered employees—park rangers and park police, for example—engage in activities related to law enforcement. However, courts all over the nation have rejected random or compulsory drug testing of ordinary law enforcement officials similar to these officers. [17]

Moreover, the sweep of the Department's program is breathtaking. As noted, fully one quarter of the Department's employees were designated as occupying positions of such sensitivity as to warrant the invasion of their privacy notwithstanding the absence of the slightest suspicion of wrongdoing. These positions include such

ness for duty, security of classified information, integrity, and public image do not justify random testing where drug use is not a problem); *NTEU v. Lyng, supra,* at ——; *Capua v. City of Plainfield,* 643 F.Supp. 1507, 1537 (D.N.J.1986); *NFFE v. Carlucci,* 680 F.Supp. 416 (D.D.C.1988); *RLEA v. Burnley,* 839 F.2d 575 (9th Cir.1988), *cert. granted,* —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *Guiney v. Roache,* 686 F.Supp. 956 (D.Mass.1988); *Taylor v. O'Grady,* 669 F.Supp. 1422 (N.D.Ill.1987); *Thomson v. Weinberger,* 682 F.Supp. 829 (D.Md.1988); *Amalgamated Transit Union, Local 1277 v. Sunline Transit Agency,* 663 F.Supp. 1560 (C.D.Cal. 1987); *Hansen v. Turnage,* No. 88–30261, slip op. (N.D.Cal. July 28, 1988); *AFGE v. Thornburgh,* No. 88–20729 (N.D.Cal. Jan. 6, 1989); *Owner-Operators Independent Drivers Association v. Burnley,* 705 F.Supp. 481 (N.D.Cal. Jan. 6, 1989). For additional decisions which have invalidated testing, *see* note 17, *supra.*

To be sure, in a few cases, involving nuclear power plant operators, correctional officers, or pervasively regulated police officers, testing was upheld under the so-called administrative search exception. *See Rushton v. Nebraska Public Power Dist.,* 844 F.2d 562, 566 (8th Cir.1988); *McDonnell v. Hunter,* 809 F.2d 1302, 1308 (8th Cir.1987); *Policemen's Benevolent Ass'n. v. Washington Township,* 850 F.2d 133 (3d Cir. 1988). However, other courts have criticized the use of that exception outside the realm of searches of property, *RLEA,* 839 F.2d at 585; *NFFE v. Carlucci,* 680 F.Supp. at 431 n. 13, and in any event government counsel stated during oral argument here that "we have never relied upon the administrative search doctrine." Other decisions cited by the government did not involve random drug testing at all. *See Jones v. McKenzie, supra* (testing during regular medical examinations for employment purposes in the context of a veritable "drug culture" among the target population); *NTEU v. Von Raab,* 816 F.2d 170 (5th Cir.1987) (testing of Customs Service employees seeking transfers to sensitive jobs); and *Division 241, Amalgamated Transit Union v. Suscy,* 538 F.2d 1264 (7th Cir.1976) (post-accident and reasonable suspicion testing).

**14.** *Uniformed Division,* slip op. at 12. Judge Flannery also noted that these officers had a lesser expectation of privacy than the average government employee due to the expansive background checks and the requirement of periodic medical examinations. *Id.* at 18.

**15.** Even at that, there is some doubt as to the continued viability of the *Dole* decision, for that case was decided before the Court of Appeals held in *Jones,* contrary to Judge Gesell's view in *Dole,* that strong privacy interests are at stake in urinalysis testing. *Jones,* 833 F.2d at 339.

**16.** *See also,* note 13, *supra.*

**17.** *Guiney v. Roache,* 686 F.Supp. 956 (D.Mass, 1988) (police officers); *Bostic v. McClendon,* 650 F.Supp. 245 (N.D.Ga.1986) (police officers); *Feliciano v. City of Cleveland,* 661 F.Supp. 578 (N.D.Ohio 1987) (police cadets); *AFGE v. Weinberger,* 651 F.Supp. 726 (S.D.Ga.1986) (army civilian police officers).

routine job classifications, non-sensitive by any normal definition of that term, as clerical assistants; mail and file clerks; secretaries; administrative clerks; computer operators and specialists; petroleum engineering technicians; personnel officers; various scientists and engineers; surface mining reclamation specialists; auditors; power plant control room operators; cartographers; printing press operators; and some 3,753 Bureau of Indian Affairs teachers, education specialists, counselors, dormitory attendants and social workers.[18] It hardly constitutes hyperbole to say that the designation of thousands of employees of this type as being all in sensitive positions is bureaucracy run amok.

Obviously, the governmental interests at stake vary with particular positions, some of them implicating interests of various strengths in worker and public safety, workplace efficiency, and security. However, the government refused at oral argument to distinguish among these positions, arguing that they were all equally sensitive, and the Court therefore evaluated the issue raised on that basis. In any event, absent some demonstration of a drug problem, random testing of any of the incumbents in any of these positions is unwarranted, since the government has utterly failed to show any nexus between the asserted interests and the testing program.[19]

These considerations take on special significance in view of the fact that on the other side of the Fourth Amendment balancing equation stand plaintiffs' strong privacy interests. The Court of Appeals in *Jones v. McKenzie, supra,* recognized those interests in the context of compulsory urinalysis as such, 833 F.2d at 339,[20] and it further noted that drug testing can "provide Government officials with a periscope through which they can peer into an individual's private life, even in her home." 833 F.2d at 339. The problem of course is that the urinalysis test picks up not merely illegal drugs but also legal ones, and an employee faced with such findings will have to explain to the Department's officers the possibly intimate details of his legitimate drug-taking and the underlying illness or illnesses.

In sum, for the reasons indicated, the interests asserted and demonstrated by the government simply are not so compelling as to outweigh these very potent privacy interests.[21] For a discussion of the other criteria governing the issuance of a preliminary injunction, *see also,* Part V, *infra.*

### III

■ The government also argues that an injunction against the entire Interior Department's random testing program exceeds the scope of this action, stating (1) that the *Bangert* plaintiffs, while alleging class representation in the complaint, have not moved for class certification and that this precludes class-wide relief, and (2) that the six positions represented by these plaintiffs do not include all the different types of positions designated for random testing.

There is no merit to those contentions. In the first place, all employees randomly tested will be subject to the same degrading procedure, and all are equally vulnerable to the further invasion of privacy recog-

---

**18.** *See also* note 29, *infra.*

**19.** *See Harmon v. Meese,* 690 F.Supp. at 68–69 (random testing not justified at inception where no drug problem exists).

**20.** *See also, NTEU v. Von Raab, supra; RLEA v. Burnley, supra;* and *see* Part V, *infra.*

**21.** Although the discussion in the text above is dispositive of the merits issues, the Court further concludes that the random testing is not reasonable in scope, thus failing also the second prong of the balancing test.

The government's only legitimate interest in randomly testing its employees is the elimination or reduction of drug use that impairs on-the-job performance. *Meese,* 690 F.Supp. at 68; *NFFE v. Carlucci,* 680 F.Supp. at 434. However, the government itself concedes that its testing is not, nor can it be, as presently constituted, limited to determining impairment on the job. *NFFE v. Carlucci,* 690 F.Supp. at 46, 49. This Court also concurs in the conclusion reached in *Carlucci* that the testing is "excessively intrusive." 680 F.Supp. at 434.

Since the searches are not limited in scope to their only legitimate objective, the random testing program is not reasonable in scope, and thus constitutes an unreasonable search on that basis as well.

nized in *Jones*, that is, that the test results provide a periscope into their private lives. Beyond that, the positions of the nine named *Bangert* plaintiffs collectively entail the vast majority, if not all, of the justifications for the program.[22]

The compelling interests identified by the Department in relation to these nine plaintiffs include concern that drug use could impair the judgment of armed park rangers, thus jeopardizing public safety; protection of sensitive information controlled by park superintendents; safety and efficiency concerns in power plant operations; impairment of the skill, judgment, and alertness of department attorneys and their access to vital information and the possibility of blackmail; the high level of public trust in division chiefs; and the compromise of national security information in the possession of key personnel officers. These concerns are all represented by the nine plaintiffs. The Court sees no reason for bringing before it additionally a representative of every single discrete position. The plaintiffs before the Court are sufficiently representative of the class.

The government makes similar arguments with regard to the plaintiffs in the *NFFE* action, and it further argues, once again, that the union and its local do not have standing absent a showing that they have at least one member in each of the positions. But it is clear that the union has representational standing under the conditions set out in *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Here, too, it has been sufficiently shown that the positions mentioned adequately involve the various interests and support a suit by the union on behalf of all its members.

## IV

▪ The *Bangert* plaintiffs also challenge the Interior Department's "reasonable suspicion" testing program. Although

this program began in October, no Interior Department employee has yet been tested.

Under the Department plan, reasonable suspicion testing may be based upon, "among other things," (1) observable phenomena, such as direct observation of drug use or possession and/or the physical symptoms of being under the influence of a drug; (2) a pattern of abnormal conduct or erratic behavior; (3) arrest or conviction for a drug-related offense, or the identification of an employee as the focus of a criminal investigation into illegal drug possession, use or trafficking; (4) information provided either by reliable and credible sources or independently corroborated; or (5) newly discovered evidence that the employee has tampered with a previous drug test. Department plan, Part II, section .9.

It would appear that under the Supreme Court precedents (*see* note 32, *infra*), the "reasonable suspicion" part of the program is valid (although that is not completely certain). In any event, although the several listed factors are appropriate as a generality to justify urinalysis testing, significant safeguards—which are not mentioned one way or the other in the plan—are necessary for the protection of the employees' rights. Without belaboring the point, this Court will simply state that it agrees with the decisions in this Circuit and elsewhere that have upheld reasonable suspicion testing but have decided that it must be conducted under circumstances exhibiting individualized suspicion of on the job impairment, and with evidence of substantial reliability. *See* particularly *NTEU v. Lyng*, at ——; and *Hansen v. Turnage*, No. 88–30261 (N.D.Cal. Sept. 12, 1988). The Court is in agreement with the standard adopted by Judge Aguilar in *Turnage* that:

> Urinalysis drug testing must be based on reasonable suspicion of on-duty drug use or drug-related job impairment supported by specific, personal observations that a supervisory or managerial employee can articulate concerning the job performance, appearance, behavior, speech, or

---

**22.** *See* Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunc- tion, pp. 23–24, 36–46.

bodily odors of the employee ... [H]earsay information collected from a third, unidentified source should be corroborated by a supervisory or managerial employee with experience in identifying on the job impairment caused by drug use. The official authorized to approve reasonable suspicion of on the job impairment due to drug use must have training and experience in the evaluation of drug induced impairment.

Like other tribunals, this Court therefore upholds reasonable suspicion testing provided that it conforms to these necessary safeguards. The Court also rejects the open-ended "among other things" clause.

## V

Violations of the rights of citizens have undoubtedly occurred on a larger scale than those that are called for by this testing program,[23] but surely not very often. For an explanation of this assessment, it is appropriate to place the Interior Department's drug testing program in a broader perspective than has usually occurred.

The drug trade, with its associated criminal activity, even murder, represents an extremely grave menace to this nation, and few know this better than those in law enforcement—be they police officers, drug enforcement agents, prosecutors, or judges—who are frequently face to face with those responsible for this scourge and those who are its victims. Energetic measures, including stiff sentences for convicted distributors of drugs, have been mandated by the Congress and are daily applied by the courts. Perhaps even more must and will be done both to punish the hardcore criminals who engage in this trade in its various facets and to deter others.

But the government-wide program of which the Interior Department plan under consideration here is a part has very little to do with fighting the drug menace or the drug sellers, nor does it even have much to do with curbing the use of drugs. The program does not in substance address any of these: stripped of the verbiage that surrounds it, that program is essentially but a show, perhaps an educational show, in which the civil servants employed at the Interior Department are the involuntary players.[24]

The Executive Order issued in 1986 requires the various departments and agencies of government to conduct testing programs among their employees in order that these departments and agencies might be pronounced drug free. No study was conducted, either theoretical or practical, to determine whether the government's employees in all departments and agencies or in any particular department or agency were involved to any extent, or at all, in the illegal use of drugs.[25] In December of 1987, the Department of the Interior announced its own, more specific plan for the testing of its employees pursuant to the Executive Order. That plan, too, was not preceded by or based upon a study of any kind regarding the incidence of drug use among the employees. There still has not been any such study. Yet notwithstanding the absence of any evidence of drug use among them, large-scale testing of the Department's employees is to begin tomorrow, January 31, 1989. What, then, is the justification for that program?

As stated above, the Department has some 70,000 employees. The Interior Department has been unable to cite *a single drug-related accident, safety violation, or*

**23.** The internment of the Japanese Americans during World War II is, of course, one such program.

**24.** The catalyst for the drug testing program was a recommendation of the President's Commission on Organized Crime which wanted the federal government to "set an example." *See* President's Commission on Organized Crime, "America's Habit: Drug Abuse, Drug Trafficking, and Organized Crime," U.S. Govt. Printing Office (1986), pp. 450, 483.

**25.** The Court, of course, has no argument with the laudable goal of a drug-free workplace. However, as was noted in *Harmon v. Meese,* "the issue 'is not whether drug use, off-duty or on-duty is incompatible with federal employment. Rather the question is *by what means* it is permissible to come by evidence of such drug use.'" 690 F.Supp. at 67 (*quoting AFGE v. Weinberger,* 651 F.Supp. 726, 735 (S.D.Ga.1986)) (emphasis in original).

*incident of blackmail or bribery*, the usual consequences of drug use cited by the government. More, the 41 Department employees identified as drug users last year (and the comparable number during the preceding five years) represent only about one-twentieth of one percent of the work force.[26] What these figures demonstrate is what anyone thinking about the problem knows intuitively—there are few, if any, concentrations of individuals, whether in professional, social, or residential circles, that are freer of illegal drugs than the faithful, loyal, perhaps somewhat stolid, not very "hip" members of the federal bureaucracy.[27]

Yet it is to these that the government policymakers have turned their attention; they have proclaimed that these public servants and their environment must be made "drug free." So far so good. Indeed, one

might well ask—why not, if the necessary public funds are available?[28] The reason why not is as simple as it is obvious: the government's objective can be achieved only by means of a wholesale violation of the individual rights of the affected employees. Indeed, it is not an exaggeration to state that in the government's intended search for the proverbial needle in a haystack, the one user of drugs out of 2,000 employees, unconstitutional procedures must be applied that have few parallels for scope and intrusiveness.

Under the Department's program, about twenty-five percent of its employees, or some 17,000 of them,[29] both men and women, may be subjected to tests which require urination within earshot or under the eye of the government's inspectors.[30] Yet not one of those who will be forced to undergo these humiliating procedures is as much as

26. Moreover, these individuals, it should be remembered, were not distributors or importers, but mere users of a drug, perhaps only of marijuana. (The *maximum* penalty for the possession of marijuana is one-fifth to one-tenth that of the *minimum* penalty for the distribution of heroin (or crack). *Compare* 21 U.S.C. § 844 *with* 21 U.S.C. § 841.)

27. The average government employee is over forty years of age, well educated, and has over thirteen years of federal service, and earns over $28,000 annually, Steele, "Profile of the 'Typical' Federal Civilian Non–Postal Employee," Office of Personnel Management, March 31, 1988, a profile quite unlike that of the typical drug abuser.

28. The identification of each individual drug user in a federal department is estimated to cost up to $13,000. *See* Statement of L. Nye Stevens, Associate Director, General Accounting Office, at 10 (June 16, 1988) (statement before Subcommittees on Human Resources and on Civil Service, U.S. House of Representatives). In view of the meager results that can be expected, those in charge of policy might well consider using these funds for a truly useful purpose, *e.g.*, the hiring of more police, customs, or drug enforcement officers to apprehend large-scale distributors of cocaine, heroin, crack, and the like, who are swarming all over the country, or to halt at the border or beyond the importation of drugs from various countries in South America and Asia.

29. The government asserts that all these individuals occupy sensitive positions. It is hardly credible that there are over seventeen thousand employees in the Interior Department with such status. Even such agencies as the Departments

of State or Defense may have difficulty coming up with sensitive positions in the twenty-five percent range.

In addition to the positions listed in Part II above, the following are also included in Interior's computation: staff attorneys, administrative law judges, and, lo and behold, the chief justice and the associate justices of American Samoa. The latter are regarded by the Department as needing to be drug free *inter alia,* because their use of illegal drugs could result in "adverse decisions" and because it "would be disruptive if decisions were inconsistent and contrary to law." Drug Free Workplace Policy and Procedures, Appendix A. It is questionable that incorrect judicial decisionmaking can be eliminated by a search for illegal drugs. Some of us manage to fail in that regard quite nicely without being on drugs.

Anything is theoretically possible, of course, including that the justices of the Samoan Supreme Court makes mistakes in law because they are high on crack, or that the Secretary of the Interior decides on oil reserves or parklands while under the influence of illegal narcotics or PCP. But in a society such as ours, invasions of citizens' rights are justified not by mere theoretical possibilities but only by actual, concrete facts. The search for perfect security, to be achieved irrespective of citizens' rights, is a hallmark of insecure totalitarian regimes, not of the confident constitutional democracy in which we live.

30. The regulations do not prescribe any particular qualifications for these inspectors, referred to as collection site persons, other than that they *successfully complete training to carry out this function*. 53.Fed.Reg. at 11979.

suspected of unlawful drug use, much less is there probable cause for a search or seizure within the meaning of the Constitution. In fact, the Interior Department concedes that its program is "a system of drug testing imposed without individualized suspicion that a particular individual is using illegal drugs."[31]

In our system of law, guilt, probable cause, or even suspicion under some relaxed Fourth Amendment standard,[32] have heretofore always been regarded as personal. Collective punishment, searches and seizures based upon suspicion of entire classes, whether racial, sexual, or economic, have consistently been regarded as abhorrent to the American Constitution and the American psyche. It is on that basis that the Fourth Amendment requires particularization of persons and places, and why it regards the "indiscriminate searches of whole neighborhoods" (and presumably of whole government departments) as the primary abuse to which that constitutional guarantee was addressed.[33]

Even if one were to assume, *arguendo*, that probable cause or reasonable suspicion can be generated on a group rather than an individual basis, the Interior Department program would still fall short. The statistical probability is only about one in two-thousand that a drug user—not a dealer, but a user—will be found through the Department's vast testing mechanism.[34] Yet to reap this meager harvest, thousands upon thousands of American citizens, loyal employees of the federal government, will under the plan be subjected to a significant affront to personal dignity, to an invasion of their privacy, and to gross humiliations.

Having failed to find evidence of more than minuscule drug use in the Department of Interior itself, the government argues that the existence of a *national* drug problem is "more than sufficient"[35] to legitimize what it intends to do.[36] In the government's view, because there is a drug problem out there, anyone can be required to undergo urine testing, even if he and the circle in which he lives or works appear to have no relationship whatever with drugs.[37] Seldom has so far-reaching a doctrine, and one that is so at odds with the tradition of individualized decisionmaking in the constitutional context been proclaimed by an agency of government in time of peace.

Drug sellers can easily be found at dozens of well-identified street corners here in the nation's capital,[38] as they probably can also be found in many other urban areas. There must be thousands of places in this

---

**31.** Department Plan Part I, section 1.3(I).

**32.** *O'Connor v. Ortega, supra,* 480 U.S. at 725, 107 S.Ct. at 1502; *New Jersey v. T.L.O., supra,* 469 U.S. at 341, 105 S.Ct. at 742.

**33.** *Wallace v. King,* 626 F.2d 1157, 1160 (4th Cir.1980); *see also, New Jersey v. T.L.O., supra,* 469 U.S. at 335, 105 S.Ct. at 739.

**34.** The forty-one employees who were determined to be users last year had come forward voluntarily. It is doubtful that a compulsory program will yield results of even this small scale.

**35.** Defendant's Memorandum in Opposition to [*Bangert*] Plaintiffs' Motion for Preliminary Injunction at 53.

**36.** The cases reject that notion. *See, e.g., Harmon v. Meese,* 690 F.Supp. at 68; *NTEU v. Lyng,* at —— n. 40; *Hansen v. Turnage,* No. 88–30261, slip op. at 9 (N.D.Cal. July 28, 1988) ("evidence of a nationwide drug problem cannot be generalized to subject innocent and hardworking federal employees to urinalysis").

**37.** Since government employees are entitled to the protection of the Constitution like everyone else, it is entirely unclear that the government's theory could not, by its own logic, be extended beyond such employees to the public at large. Thus, a national illegal immigration problem, or homicide problem, or white collar crime problem could all be used to justify searches and seizures of persons and in places far removed from the actual site of the problems.

Indeed, if what the Department of Justice says here is good law, it could be argued with equal plausibility that, for example, the scandals in the savings and loan business supply legality to forced entries and searches for financial papers in the homes of savings and loan officers who are entirely unaffiliated with the problem S & Ls; or that the alleged corruption among defense contractors provides sufficient authority for warrantless searches of the residences of all those doing business with the Department of Defense.

**38.** The *Washington Post* last month printed a map of existing outdoor drug distribution markets.

country where drug users congregate and can be located with a far greater degree of certainty than in the offices of the Department of Interior—from the salons of Hollywood and Manhattan to the street corners where the defeated and hopeless from some of the nation's low income housing projects congregate. Yet the government has singled out its loyal, almost completely drug-free public servants for a vast, intrusive testing program as the only one where the drug menace must be fought without the normal constitutional protection of individualized cause.

It is difficult to escape the conclusion that it must have seemed relatively easy to make a good educational gesture on the backs, or rather the privacy, of these public servants, and this notwithstanding the Supreme Court's ruling in *O'Connor* less than two years ago that government employees, too, are entitled to constitutional protections in their work place.[39]

In addition to dispassionate analysis, this case, like such cases as *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), cries out for a sense of outrage. In *Rochin*, Justice Frankfurter, speaking for the Court, said with respect to the

seizure of drugs through the pumping of a suspect's stomach:

... we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceedings by agents of the government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.[40]

342 U.S. at 172, 72 S.Ct. at 209.[41]

Let there be no mistake about this: this case is not just about another slight deviation from the proper constitutional search and seizure standard in a particular case or a handful of cases which the courts are accustomed to considering on a "retail" basis. Rather, it presents for judicial consideration a wholesale deprivation[42] of the most fundamental privacy rights[43] of thou-

---

**39.** The government cannot even rely on the defense of necessity; no one in government appears to have conducted a study of any kind to determine whether less intrusive means than the urine testing program (*e.g.*, observation of erratic behavior, the noting of frequent absences, careful hiring) might suffice to identify such drug problems as may exist in the federal bureaucracy. *See Delaware v. Prouse*, 440 U.S. 648, 659, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660 (1979).

**40.** Let it be recalled that in that case the police were at least looking for real evidence of crime; here, the Interior Department is on the most tenuous fishing expedition. Yet the privacy invasion is similarly obnoxious.

**41.** That outrage may also be likened to that displayed by former Secretary of State George Shultz, a patriot and a sturdy example of bedrock American values in the mold of Henry Stimson, George Marshall, and Mike Mansfield, who, when he was asked to participate in a somewhat similar, though not quite as degrading a ritual—the taking of a polygraph test—stated that he would rather resign. The Court is not suggesting that anyone resign; it is suggesting that the courts have an obligation to exhibit

a similar capacity for outrage in the exercise of their constitutional obligations when this is the appropriate response.

**42.** It so happens that the Interior Department has cast its net wider than other government agencies in its designation of incumbents of positions to be tested. Its unrestrained performance thus puts it at the forefront of the current disregard of constitutional protections.

**43.** The passing of urine has always been regarded among civilized peoples as a peculiarly private function; because of the religious, social, or cultural taboo against urination in public, such an activity is even criminal in many states. *NTEU v. Von Raab*, 816 F.2d at 175.

Professor (now Solicitor General) Charles Fried wrote accurately as follows regarding the "symbolic importance" accorded certain "conventionally designated areas of privacy":

... [I]n our culture the excretory functions are shielded by more or less absolute privacy, so much so that situations in which this privacy is violated are experienced as extremely distressing, as detracting from one's dignity and self esteem.

Fried, *Privacy*, 77 Yale L.J. 475, 487 (1968).

sands upon thousands of loyal, law-abiding citizens, and the deprivation of their rights, not because anyone actually suspects that they are drug users but because they are employees of the government whom that government believes it can command on that account to repair to the toilets, so that it is able thereby to demonstrate its commitment to the war on drugs.[44]

The courts are not competent to judge the wisdom of such a policy or its cost effectiveness.[45] But it is the halting of an invasion of the most personal privacy rights that, under the Constitution, is among the highest responsibilities of the federal judiciary.[46] For all the reasons discussed above, the Court has concluded that plaintiffs enjoy a very high likelihood of succeeding on the merits of this action.

In addition to likelihood of success, the Court is also required to consider on a motion for preliminary injunction the relative injuries to the parties from the grant or denial of such relief.

The government argues in that regard that an employee who uses illegal drugs could cause significant harm to the important missions of the Department of Interior. Whatever one might think of the intrinsic value of the testing program and the nature of the duties of most of the employees to be tested,[47] it is plain that the Interior Department does not regard that program as having a high priority, nor do the Department's actions suggest that it regards delay in implementation as particularly harmful. It has taken the Depart-

ment almost two and one-half years since the Executive Order was issued to establish the machinery for its testing program. With that kind of a delay, a further postponement pending a decision on the merits can hardly be regarded as inflicting serious injury on that Department.

By contrast, if relief is not granted to the plaintiffs, the injury to them and the other Interior Department employees will be irreparable, for the humiliation and indignity to which the employees would be subjected under the testing program could never be undone.

Indeed, if the injunction does not issue, the following scene may become both familiar and commonplace: as the tourists view the majestic Interior Department buildings from the outside, there being lectured by their tour guides on the freedoms under our system of government, on the inside of these buildings platoons of bureaucrats will march in unending streams toward the Department's toilets for their next urination procedure under the steady gaze of the government's urination inspectors.[48] As the toilets are reached, these inspectors will make certain that the candidates' outer garments are removed and nothing untoward has been hidden, that the water in the bowl is sufficiently blue, the urine is at the correct temperature of between 90.5 and 99.8 degrees Fahrenheit, and the cup is sufficiently full. If the cup is not filled as required by the regulations, the employee will at this point be required to drink more liquids and then urinate

---

**44.** Many educational avenues not violative citizens' rights are of course available. Thus, former First Lady Nancy Reagan appears to have had success with her "Just Say No to Drugs" campaign. In the same vein, President Bush seemed to suggest last week that he regarded drug education as in the realm of pro bono advertising. *New York Times,* January 28, 1989, p. 7.

**45.** However, as indicated above, *supra* note 28, the use of the funds committed to this program in one designed vigorously to apprehend, prosecute, and jail drug sellers could be expected to do far more good.

**46.** In this way the courts may also help to ensure that, unlike the Japanese–American internment program, *see* note 23, *supra,* the currently threatened wholesale invasion of rights will not

have to be the cause for regret a generation later.

**47.** As indicated *supra,* most of the individuals to be tested are teachers, clerks, secretaries, personnel officers, and the like. Moreover, the Department's experience has been that not one employee at whatever level could be pointed to as having harmed any governmental interest whatever as a consequence of drug use.

**48.** If the program is not to be senseless, the testing of the thousands in "sensitive positions" will have to be repeated again and again, to ensure that the clerks, lawyers, and personnel officers who were drug free in May are still so in July.

again; and if the urine temperature is not satisfactory, the employee will likewise have to urinate again, this time under the direct visual observation of the inspector. It may be expected that all this time many other presumably trusted and valued [49] civil servants of the United States will stand in line, awaiting their turn at this procedure. Only a Kafka, an Orwell, or a Gogol could do true justice to such a scene, or perhaps, in keeping with the farcical aspects of this tragedy, those modern masters of the absurd, Samuel Beckett or Eugene Ionesco.

That is not what the United States Constitution contemplates with respect to free American citizens, particularly not where the threat these citizens are assumed to represent is so wildly speculative as it is here. Accordingly, and for the reasons stated, the Court is contemporaneously herewith issuing the preliminary injunction sought by the plaintiffs.[50]

## ORDER

Upon consideration of plaintiffs' motions for preliminary injunction, the memoranda and exhibits submitted by the parties, and upon hearing in open court, it is this 30th day of January, 1989, in accordance with an Opinion issued contemporaneously herewith,

ORDERED that plaintiffs' motion for preliminary injunction in Civil Action No. 88–3518 be and it is hereby granted, and plaintiffs' motion for preliminary injunction Civil Action No. 88–3549 be and it is hereby granted in part and denied in part; and it is further

ORDERED that defendant and his agents and employees be and they are hereby enjoined until further order of the Court from conducting the proposed Department of the Interior random urinalysis testing of the plaintiffs, the classes they represent, and the members of the National Federation of Federal Employees, and from taking any adverse personnel action against such individuals based upon their failure or refusal to participate in such testing; and it is further

ORDERED that the request of the plaintiffs in Civil Action No. 88–3549 for a preliminary injunction against "reasonable suspicion" drug testing be and it is hereby denied, provided that such testing by defendant or his agents and employees is based upon reasonable suspicion of on-duty drug use or on-duty drug-related job impairment, supported by (a) evidence of specific, personal observations concerning job performance, appearance, behavior, speech, or bodily odors of the employee; or (b) if hearsay information is received from an unidentified source or sources, by corroborative evidence from a manager or supervisor with training and experience in the evaluation of drug-induced impairment.

---

**49.** The implicit reflection on the trustworthiness of every one in the Department is another injury to legitimate employee interests. Their morale is hardly likely to be enhanced by being singled out, among all workers in the United States, as likely drug offenders.

**50.** As noted above, the Court's order prohibits any implementation of the random drug testing program; and it approves the "reasonable suspicion" part of the program to the extent that it is modified to include the safeguards specified in Part IV above.